# · SUPPLEMENT.

[United States Circuit Court for the District of Connecticut. April 23d, 1884.]

## THE HOLYOKE WATER POWER COMPANY *vs.* THE CONNECTICUT RIVER COMPANY.

Where works are constructed, in the exercise of ordinary care, under authority of a state, for the benefit of a navigable river within its borders, and a necessary consequential injury results to land within the state, no relief will be granted against the injury.

But a state has no power, by such exercise of its authority within its own jurisdiction, to subject to injury property which lies beyond its jurisdiction.

An injunction granted against the raising of a dam across Connecticut River at Enfield Falls within this state, for the purpose of benefiting navigation by means of a canal around the falls, under authority of an act of the legislature of this state, where it would cause injury to mill property above that was within the state of Massachusetts.

BILL IN EQUITY for the removal of an existing dam across Connecticut River, and for an injunction against a threatened raising of the dam.

The Connecticut River Company was incorporated by the General Assembly of the state of Connecticut in 1824 " for the purpose of improving the navigation of Connecticut River, with power to make a canal with locks around Enfield Falls, and to construct (with certain restrictions) a dam across the river at the upper end of the canal. The dam and canal were completed in 1829 and the navigation of the river has since then been through the canal. The whole was placed by the act of incorporation under the supervision of a board of commissioners, and under their direction the dam was raised in 1849, and so continued until 1881, when the General Assembly of Connecticut authorized the company to fill a gap which had from the first been left in the centre of the dam for the passage of boats and lumber and to increase the height of the whole dam.

The Holyoke Water Power Company, incorporated by the legislature of Massachusetts in 1859 and located at Holyoke on the west side of the Connecticut River, had, by a dam across the river at that place, created an extensive and valuable water power, which was distributed through three canals parallel with the river and on three successive levels, so-arranged that the water passed, as it was used, from one level to another. A large number of mills had been built along these canals and a large population had settled about them. The corporation owned about four hundred and forty acres of land, of which about three hundred and ninety were building lots and about fifty were mill-sites, and twenty acres of these mill-sites were on the third level and near the river. It owned the river front, about nine thousand and six hundred feet in length, and about five thousand five hundred feet further along on the bank of the river.

The present suit was brought by the Holyoke Water Power Company in September, 1881, after the Connecticut River Company had filled the gap between the two wings of the Enfield dam, but before the whole dam had been raised above its previous height. The bill alleged that the now solid dam, and the raising of it as authorized by the legislature of Connecticut, and as intended by the River Company, would set the water back upon the plaintiffs' works, would overflow their land, impede the operation of the mills, diminish the effective head of the fall of the water, and commit irreparable injury to their property, and prayed that the defendants might be ordered to remove the obstruction between the wing dams, and enjoined against raising the dam.

*N. A. Leonard*, of Massachussetts, and *A. P. Hyde*, for the plaintiffs.

*H. C. Robinson, C. E. Perkins, C. H. Briscoe* and *A. F. Eggleston*, for the defendants.

SHIPMAN, J. (After stating the general facts.) Two facts are conceded by all the witnesses. The first is, that, at low water, which is generally stated to be a flow of four thousand cubic feet per second at Holyoke, the Connecticut River between Holyoke and the defendant's dam, as it existed before the gap was filled, was nearly a still pond. Mr. Hershel says that "a slope of only four inches sufficed to convey four thousand cubic feet per second from Holyoke to the Enfield dam." Therefore any material additional obstruction placed upon the Enfield dam of 1849 or 1855 would be perceptible in the river at Holyoke at the time of very low or low water. The second conceded fact is, that the defendant's dam, as it was, or as it is now constructed, is so low that, as the volume of water increases in the river and flows over the dam, there is a point where the present dam would cause no injury at Holyoke. The amount of the rise of the water which is ordinarily caused by the present dam, the fact of injury, the length of time during which any injury would be perceptible, and the point at which any injury would cease, are controverted questions.

[The testimony is here reviewed.]

From the testimony in the case no certain and indisputable conclusion can be reached, either as to the length of time in each year in which the influence of the present dam will be known at Holyoke, or as to the amount of the flow of water at which the influence of the dam will cease to be felt; but my opinion is that, with a flow of seven thousand cubic feet per second, the effect will be unknown, or that such effect will be perceived at Holyoke between thirty and ninety days during the dryest part of the year.

The next point is as to the amount of damage which is caused by the present structure.

The rise is simply a rise within the banks of the river. It overflows nothing, it occupies no land. As the works of the existing mills are arranged, it is impossible for this obstruction to set back any water upon their wheel pits or canals.

The fall on the third level. canal, as computed by Mr.

Herschel in the order of his arrangement of months, is as follows:—Dryest or first, 25.10 feet; second, 24.80; third, 24.20; fourth, 23.65; fifth, 23.10; sixth, 22.35; seventh, 21.65; eighth, 20.85; ninth, 20.00; tenth, 18.85.

The usual lease heretofore in use has been for a fall of twenty-four feet. It is of course practicable for the lessors and lessees of power at Holyoke to alter their indentures and for the lessees to alter their structures. so as to utilize every inch of fall that is attainable during the dryest portion of the summer, and it may be possible for the plaintiff so to arrange its contracts with the present lessees or with the purchasers of unsold mill power as to derive a pecuniary benefit from the slight additional amount of fall during this dry period; but the damage which will accrue to the plaintiff from the present Enfield dam seems to me to be theoretical and fanciful rather than actual. In the months of August and September, it might have a nominal advantage if the gap had not been filled, but I cannot deem it reasonable that no change should be permitted in the structures for the benefit of navigation sixteen miles distant from Holyoke, in order to furnish the Holyoke company with an advantage which consists far more in theory than in fact. During nine or ten months in the year this obstruction will not be known at Holyoke; during two or three months it can be perceived; but it practically does no damage to the owners of the water power.

In regard to the raising of the dam above its present height to the point authorized by the amendment of 1881, I am of opinion that it would produce to the plaintiff a pecuniary injury for a period of six or seven months in the year, by the diminution of its fall; but not by an overflow of its land or a taking of its property; an injury which is called a consequential injury. *McKeon* v. *Delaware Division Canal Co.*, 49 Penn. St., 424. The defendant admits in its answer that it claims the right to raise its dam to the point authorized by the amendment, and that it proposes to do so whenever necessary.

The defendant insists that inasmuch as the state of Con-

necticut authorized the addition to the dam for the purpose of improving the navigation of Connecticut River within the limits of the state, any consequential injury not amounting to the taking of land, which is occasioned in the exercise of ordinary care, by reason of such improvement, to the land of a riparian proprietor, is *damnum absque injuriâ;* and it may be considered as settled that where a state, by itself or by its agents, in the construction of works authorized or directed by the legislature of such state for the benefit of the navigation of a navigable river within its borders, causes, without malice and in the exercise of ordinary care, a necessary consequential injury to land within its borders, no relief will be granted against such injury.

The state and federal courts concur in the assertion of this principle. The Supreme Court of Errors of Connecticut says, in regard to works erected for the improvement of the navigation of Connecticut River:—" The public, being the owners of this river, have unquestionable right to improve the navigation of it, without any liability for remote and consequential damage to individuals." *Hollister* v. *Union Company*, 9 Conn., 436.

"Acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the state or its agents, or give him any right of action. This is supported by an immense weight of authority. * * * We have examined the decisions of the courts of Illinois, and others to which we have been referred by the plaintiffs in error, but in none of them was it decided that a riparian owner on a navigable stream, or that an adjoiner on a public highway, can maintain a suit at common law against public agents to recover consequential damages resulting from obstructing a stream or highway in pursuance of legislative authority, unless that authority has been transcended, or unless there was a wanton injury inflicted, or carelessness, negligence or want of

skill in causing the obstruction." *Transportation Co.* v. *Chicago*, 99 U. S. Reps., 635.

In this case the injury will be caused to property beyond the limits of Connecticut, and the question arises whether the doctrine which has been asserted is applicable to this state of facts.

This question has never, so far as I can ascertain, been decided by the courts of this country. The question has arisen whether, by virtue of the right of eminent domain, one state can take, or subject to public use, land in another state, and the decisions have naturally been against such a power. *Farnum* v. *Canal Co.*, 1 Sumner, 46; *Salisbury Mills* v. *Forsaith*, 57 N. Hamp., 124; *Wooster* v. *Great Falls Co.*, 39 Maine, 245; *United States* v. *Ames*, 1 Wood. & Min., 76. In two cases which have recently arisen in federal courts and which involved the right of a state to regulate or to improve the navigation of a river wholly within its limits, the judges have carefully limited their decisions to the facts in the cases. *Escanaba Co.* v. *Chicago*, 107 U. S. Reps., 678; *Huse* v. *Glover*, 15 Fed. Rep., 296. Important suggestions which bear upon the question in this case are made by Judge TREAT in *Rutz* v. *St. Louis*, 7 Fed. Rep., 438, and by Mr. Justice McLEAN in *Palmer* v. *Commissioners of Cuyahoga Co.*, 3 McLean, 266.

The rule which has been referred to is based upon the principle that the improvement of the navigation of navigable rivers within a state is part of the state's governmental duties, and that the work which is done towards such improvement is done in the discharge of the governmental powers of the state, and that the land of the riparian proprietor within the state is subject to the just exercise of this power; and that when the state undertakes to exercise its governmental power, the public good is paramount to the consequential injury of land which is incidentally and necessarily affected by the improvement. The land is under the jurisdiction of the state and the state derives the power to inflict remote and consequential injuries upon it by virtue of such jurisdiction. The owner of land abut-

ting upon a navigable river owns it subject to the right of the state to improve the navigation of the river, because the land is within the governmental control of the state; but it seems to me that the state obtains by virtue of its governmental powers no control over or right to injure land without its jurisdiction. Jurisdiction confers the power and the right to inflict consequential injury, but when no jurisdiction exists the right ceases to exist. It is a recognized principle that the statutes of one state in regard to real estate cannot act extra-territorially. As Connecticut has no direct jurisdiction or control over real estate situate in another state, it cannot indirectly, by virtue of its attempted improvement of its own navigable waters, control or subject to injury foreign real estate. If this resolution is a bar to an action for any consequential injury to land, or to rights connected with land in Massachusetts, Connecticut is acting extra-territorially.

Let there be a decree enjoining the defendant against any further raising of its present dam and against constructing a new dam or dams to a greater height than the height occupied by the respective portions of the present structure.