ROBERT H. MCCARTER, attorney-general, informant, respondent,

*v.*

THE HUDSON COUNTY WATER COMPANY, defendant, appellant.

[Argued December 7th, 1905. Decided November 19th, 1906.]

1. The act of May 11th, 1905 (*P. L. 1905 p. 461*), whereby it is made unlawful for any person or corporation to transport through pipes, conduits, &c., the waters of any fresh-water lake, pond or stream of this state into any other state, is constitutional.

2. The first section of the bill of rights contained in our constitution, which declares that all men have certain unalienable rights, among which are those of acquiring. possessing and protecting property, &c., does not guarantee to any man the right of acquiring property in anything that is not the subject of private property by law, nor the right of disposing of property that has not been duly acquired under the law of the land.

3. The federal constitution, article 4, section 2, in declaring that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states,".does not guarantee to citizens of the State of New York, while resident there, all the privileges that they would enjoy if resident in New Jersey.

4. A charter acquired under our General Corporation act of 1875 and its supplements (*Rev. 1877 p. 179, p. 1282; 1 Gen. Stat. p. 907; P. L. 1876 p. 103*), for the purpose of damming rivers and streams, and storing, transporting and selling water, cannot be deemed to authorize the depletion of our streams for the purpose of conveying water beyond the borders of this state.

5. The act of May 11th, 1905 (*P. L. 1905 p. 461*), amounts to a repealer of the power of any company organized under the Corporation act of 1875 and its supplements, to transport water out of the state, even if such power be assumed to have been acquired under the latter acts.

6. The General Corporation act of 1896 (*P. L. 1896 p. 277 § 6; P. L. 1899 p. 473*), does not authorize the incorporation of companies for the purpose of diverting water from streams and storing and selling the water thus diverted.

7. The common law recognizes no right in the riparian owner as such to divert water from the stream in order to make merchandise of it.

8. This state has not, by statute, changed the rule of the common law so as to make the water of our lakes and streams the subject-matter of commerce in the ordinary sense, nor has it authorized water diversion for other than riparian uses, saving for a limited class of purposes beneficial to the people of this state.

9. The legislative policy of this state has been, and is, to preserve and administer our water rights for the benefit of our own people, to whom by right of proximity and sovereignty they naturally belong.

10. The State of New York, or the people thereof, have no inherent right to withdraw a supply of water from the territory of New Jersey by artificial means.

11. The control of fresh water running in the natural streams, and in lakes and ponds that have outlets in such streams (subject to the interests of riparian owners therein) resides in the state in its sovereign capacity as representative of and for the benefit of the people in common, and the legislature may prohibit the abstraction of such water, saving for riparian uses and for purposes authorized by legislative grants.

12. The act of May 11th, 1905 (*P. L. 1905 p. 461*), which forbids the abstraction of such water for transportation beyond the bounds of the state, is not in violation of the interstate commerce clause of the federal constitution, because water abstracted contrary to the statutory prohibition cannot legitimately enter into interstate commerce.

13. The State of New Jersey, as owner of the bed of the Passaic river where flowed by the tide, has a proprietary right to the continued flow of the stream, which is paramount to the rights of upper riparian owners to withdraw water for purposes other than those incident to riparian ownership.

On appeal from a decree of the chancellor, advised by Vice-Chancellor Bergen, whose opinion is reported *ante p. 525*.

*Mr. Richard V. Lindabury* and *Messrs. Collins & Corbin,* for the appellant.

*Mr. Robert H. McCarter,* attorney-general, for the respondent.

The opinion of the court was delivered by

PITNEY, J.

The decree that is here under review awards an injunction to restrain the Hudson County Water Company from carrying or transporting any of the waters of the Passaic river into Staten Island, in the State of New York, or elsewhere out of the State of New Jersey.

The cause was instituted in the court below by the filing of an information to which the defendant (now appellant) made answer, and was heard before the vice-chancellor upon these pleadings and upon the proofs and admissions of the parties concerning certain matters that did not clearly appear from the pleadings. It appears that the East Jersey Water Company, a corporation of this state, organized under the General Corporation act of 1875 and its supplements and amendments (*1 Gen. Stat. p. 907*), has established extensive works at Little Falls, upon the Passaic river, a short distance above the city of Paterson, and diverts water therefrom daily to the amount of thirty million gallons or more for the supply of certain municipal corporations and other consumers, and is engaged in the sale of water from the river to water companies and to municipal corporations. A system of water mains has been constructed, owned in part by the East Jersey Water Company, in part by another corporation of this state known as the New York and New Jersey Water Company, and in part by the present appellant, extending from the intake at Little Falls to and into the city of Bayonne, in Hudson county, which city lies upon the borders of the tidal waters of the Kill-von-kull, opposite to Staten Island. And that the Hudson County Water Company has entered into certain contracts, in pursuance of which it purposes to supply certain municipal corporations and other consumers upon Staten

Island from the waters of the Passaic river, employing for this purpose extensions of its water mains that are to be constructed beneath the waters of the Kill-von-kull.

The information of the attorney-general purports to be exhibited "on behalf of the state and at and by the relation of Henry B. Kummel, state geologist." The status of the state geologist as relator arises solely from a recent act of the legislature (*P. L. 1905 p. 461*), the constitutionality of which is the principal question in dispute. It is insisted by the appellant that if the act be unconstitutional, there is no other basis upon which the information can be sustained. The learned vice-chancellor, however, dealt with all the grounds upon which the prayer for injunction was rested, and we think the averments of the pleading are broad enough to warrant this course. Not only does the information purport to be exhibited on behalf of the state, as well as at the relation of the state geologist, but its averments include mention of many matters that would have been unnecessary had the statute alone been invoked, and the prayer is

"that the Hudson County Water Company, pursuant to the provisions of the act entitled, &c., approved May 11th, 1905, *and otherwise* may be enjoined from carrying or transporting any of the waters of the Passaic river into Staten Island or elsewhere out of the State of New Jersey,"

with a further prayer for general relief.

The act in question (*P. L. 1905 p. 461*) reads as follows:

"AN ACT to preserve and maintain the lakes, ponds, brooks, creeks, rivers and streams of this state, and to prevent the waters thereof from being carried by pipes, conduits, ditches or canals into other states for use therein, and to authorize the court of chancery to assist in the observance of this act.

"WHEREAS, The available waters of the fresh-water lakes, ponds, brooks, creeks, rivers and streams of this state do not increase with the growth of population, and, unless the same are carefully preserved, will become inadequate to perform the functions they were by nature designed to do, which functions are essential to the health and prosperity of all the citizens of this state; therefore,

"BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

"1. It shall be unlawful for any person or corporation to transport or

carry through pipes, conduits, ditches or canals the waters of any fresh-water lake, pond, brook, creek, river or stream of this state into any other state for use therein.

"2. It shall be the duty of the state geologist to keep a general oversight over the fresh-water lakes, ponds, brooks, creeks, rivers and streams of this state, and to see that the same are preserved for the use and benefit of the citizens and inhabitants of this state, and to prevent the waters thereof from being carried or transported by pipes, conduits, ditches or canals into other states for use therein; upon its being brought to his knowledge that it is the intention of any person or corporation to so carry or transport into any other state for use therein, the waters of any such fresh-water pond, lake, brook, creek, river or stream of this state, it shall be his duty, through the attorney-general, to apply to the court of chancery for injunction to restrain the same, and the court of chancery is hereby authorized and empowered to entertain jurisdiction of a suit in equity to preserve the waters aforesaid for the use and benefit of the citizens and inhabitants of this state, and to prevent their being, by pipes, conduits, ditches or canals, carried or transported to other states for use therein; and to that end to issue such restraining order or injunction, both preliminary and final, as may be necessary, and to enforce the same in the same manner it is empowered to enforce other injunctions or orders.

"3. This act shall take effect immediately.

"Approved May 11th, 1905."

In the printed brief for the appellant a point was raised which, although abandoned upon the oral argument, deserves mention. It is rested upon the alleged fact that the water in question is not diverted from the Passaic river by the defendant, nor even by the New York and New Jersey Water Company, but by the East Jersey Water Company, it being insisted, *first,* that the latter two companies are necessary parties defendant, and *secondly,* that since the East Jersey company is permitted to divert the water for purposes of sale, the water diverted becomes an article of commerce, traffic in which between the State of New Jersey and the State of New York cannot be constitutionally prohibited by this state. The question of interstate commerce will be dealt with hereafter. With respect to the first suggestion, we do not consider the East Jersey Water Company and the New York and New Jersey Water Company, or either of them, necessary parties to this proceeding, whose object is to restrain the transportation of fresh water from the Passaic river by means of pipes and conduits to any

point or points outside of the state. The actual situation disclosed is this: That an intake exists at Little Falls, at which certain water mains are filled, and these mains extend continuously from that point to some point or points in the city of Bayonne at or near the state line. At their terminus in Bayonne the pipes are under the control of the present appellant, which may either open them or keep them closed, at its option, unless restrained by injunction. It purposes to continue these mains to and into Staten Island, and to use them there for furnishing water to divers large consumers. If this be permitted, the water that is thus dealt out by the appellant to consumers in Staten Island will flow in a continuous stream from the Passaic river at the Little Falls intake, and while for a part of the intervening distance this water will be indistinguishably commingled with waters that are destined for distribution to other consumers along the line of the mains, it is manifest that if the defendant desists from constructing or using its main to Staten Island, the outflow from the river at Little Falls will be diminished by the precise quantity that otherwise would go to Staten Island. In effect, the water that defendant proposes to supply to Staten Island would be diverted from the Passaic river by defendant. Without its intervention this water would continue to flow in the river. No injunction nor any other relief is needed against the two companies who are owners, respectively, of the intake and of the mains above Bayonne, and therefore these companies are not necessary parties to the present proceeding.

Coming, therefore, to the merits. It is important to keep it clearly in mind that if the defendant carries out the project that it has in contemplation a considerable part of the fresh and potable waters of the river Passaic will be diverted out of the river at Little Falls, and conducted thence in a continuous, artificial channel or channels to some point outside of the State of New Jersey, and will there be permitted (subject only to defendant's control) to escape and flow forth, to the benefit of citizens of the State of New York, and to the incidental profit of the defendant.

The questions are whether such an artificial and extraterri-

torial outlet can be prevented by the people of the State of New Jersey, with or without an act of the legislature, and if an act be needed for the purpose whether the act of 1905 is a constitutional piece of legislation.

It must, we think, be sufficiently obvious that the government established in this state by and for the people thereof has complete dominion (subject only to constitutional limitations) over all things within the borders of the state, including all lands and waters, and the mode of acquiring and disposing of rights of property therein. The fresh-water lakes, ponds, brooks and rivers, and the waters flowing therein, constitute an important part of the natural advantages of this territory, upon the faith of which its population has multiplied in numbers and increased in material and moral welfare. The regulation of the use and disposal of such waters, therefore, if it be within the powers of the state, is among the most important objects of government. The act of legislation above quoted has for its avowed object the preservation of our fresh-water lakes, ponds, rivers and streams for the use and benefit of the citizens and inhabitants of this state. Aside from the immediate importance of the diversion in a given case, the act aims to prevent at the outset any extraterritorial diversion that, if permitted, might give rise to a claim of vested rights.

It is insisted the act in question is unconstitutional—*first,* as contravening the first section of the bill of rights contained in our state constitution, which declares that all men have certain natural and unalienable rights, among which are those of acquiring, possessing and protecting property, &c. In our view, however, this clause does not guarantee to any man the right of acquiring property in anything that is not the subject of private property by law, nor the right of disposing of property that has not been duly acquired under the law of the land. It is argued that while the act does not prohibit the owner of water from selling it to another person or corporation within this state, it absolutely prohibits him from selling it to any person or corporation without the state, to be used without the state. The answer is that the act, properly construed in subordination to the constitution, does not prohibit the owner of water from sell-

ing it where he will; what it prohibits is the acquisition of ownership in flowing waters for the purpose of transporting them out of the state.

*Secondly.* It is objected that the act contravenes the fourteenth amendment of the constitution of the United States, which declares that no state shall deprive any person of life, liberty or property without due process of law. To this the like answer may be made.

*Thirdly.* The appellant cites article 4, section 2 of the federal constitution, that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." It may be a sufficient answer to this to say that the appellant is a citizen of this state, and cannot be heard to plead the privilege of a citizen of any other state. But, besides, it is clear that the statute does not discriminate between citizens of different states; its prohibition is aimed at all persons, whether citizens of this state or of any other state, who may presume to do the prohibited act. Certainly it is not within the intendment of the constitutional clause that citizens of the State of New York, while resident there, shall have all the privileges that they would enjoy if resident within our borders.

*Fourthly.* The principal constitutional argument is rested upon that clause of the federal constitution (article 1, section 8) which empowers congress to regulate commerce among the several states. If the water whose transportation is prohibited, including the water of the Passaic river, of which the appellant seeks to make merchandise beyond our territorial borders, is the proper subject of interstate commerce, the state, of course, cannot interfere with the proposed traffic.

Such right as the appellant claims—to withdraw the water from the Passaic river and make merchandise of it—is derived by grant from the East Jersey Water Company. Whatever rights this company may have as against the state must rest either upon its chartered powers, upon its status as a riparian owner upon the Passaic river, or upon both of these combined.

The charter of the East Jersey company has not been introduced in evidence. It appears to have been admitted upon the hearing below that in fact the company was incorporated under

"An act concerning corporations," approved April 7th, 1875, and its supplements and amendments. *1 Gen. Stat. p. 907, &c.* Respecting the date of its incorporation the record is silent, but we must infer that it was prior to July 12th, 1895, for a contract is in evidence made by the East Jersey company on that day. Concerning the powers of the company, we know nothing except that, in fact, it is engaged in the sale of water from the Passaic river to municipal corporations, and to water companies engaged in the supply of water to municipal corporations and other consumers within the State of New Jersey. We assume, therefore, that it possesses the amplest corporate powers in respect of the diversion and sale of water that could be acquired by any company organized under the General Corporation act of 1875, and its supplements and amendments at any time prior to July 12th, 1895.

Section 10 of the Corporation act of 1875, as originally enacted (*Rev. 1877 p. 179*), made it lawful for any three or more persons to organize

"a company to carry on any kind of manufacturing, mining, chemical, trading or agricultural business, the transportation of goods, merchandise or passengers upon land or water, inland navigation, the building of houses, vessels, wharves or docks or other mechanical business, the reclamation and improvement of submerged lands, the improvement and sale of lands, the making, purchasing and selling manufactured articles, and also of acquiring and disposing of rights to make and use the same, the renting of buildings and steam or other power therewith, the cutting and digging peat, stone, marl, clay or other like substance and dealing in the same, manufactured or unmanufactured, or any wholesale or retail mercantile business, or any lawful business or purpose whatever * * * ; provided, that nothing herein contained shall be construed to authorize the formation of any railroad company, turnpike company or any other company which shall need to possess the right of taking and condemning lands, nor of any insurance company, banking company, savings bank or other corporation intended to derive profit from the loan or use of money."

By *P. L. 1876 p. 103* (*Rev. 1877 p. 1282 pl. 4*) this section was amended by inserting among the authorized objects the following:

"The damming of rivers and streams, including the storage, transportation and sale of water and water power and privileges, with the right to

take rivulets, raceways and lands and erect and maintain dams, reservoirs, raceways, mills, manufactories and other erections, and lease, mortgage, sell and convey the same or any part thereof;"

and the proviso was amended by inserting in the clause that excluded companies which shall need to possess the right of taking and condemning lands the words: "Except for the damming of rivers and streams and for purposes pertaining thereto, as hereinbefore specified." A further proviso was added, as follows:

"That this act shall not apply to any river or stream of a less width and volume of water than the Delaware river, ordinarily, at Phillipsburg, in this state, below its junction with the Lehigh, nor to any river or stream below the head of tidewater in the same."

The same supplement empowered companies established for the purpose of damming rivers and streams to construct, erect and maintain dams on rivers and streams of the width before mentioned not exceeding ten feet in height above low water, and to establish raceways and other works for the purpose of creating and using the water or water power for manufacturing purposes, provided the water so diverted should be returned again to the rivers and streams after being used. Powers of condemnation were likewise conferred, whether constitutionally or not is of no present consequence.

By supplement of March 3d, 1880 (*P. L. 1880 p. 92; Sup. Rev. 1886 p. 159 pl. 48*), and by supplement of February 29th, 1888 (*P. L. 1888 p. 112; 1 Gen. Stat. p. 946 pl. 189*), section 10 of the Corporation act of 1875 was further amended, but not so as to enlarge the power of erecting and maintaining dams, &c.

Upon the whole, therefore, we may assume that the East Jersey Water Company is endowed with corporate power to dam rivers and streams, and to store, transport and sell water, subject to the limitations contained in the act just cited. But we cannot assume (understanding the fact to be otherwise) that the Passaic river at Little Falls is of a width and volume as great as those of the Delaware river at Phillipsburg.

It appears, by admission of parties made upon the hearing

below, that the defendant and appellant was incorporated under and pursuant to "An act concerning corporations (Revision of 1896)." *P. L. p. 277.* The sixth section of this act enumerates the objects for which corporations may be formed thereunder. The power of damming streams and storing and selling water as conferred by the supplements to the act of 1875 are eliminated from the act of 1896, and in a proviso to section 6 it is declared that nothing in this act shall authorize the formation of any insurance, safe deposit or trust company, banking corporation, savings bank or other corporation intended to derive profit from the loan and use of money, or of any railroad company (except companies formed for the purpose of constructing and operating railroads in other states and territories or in foreign countries), or any turnpike company, or other company, which shall need to possess the right to take and condemn lands. By section 118 (*P. L. 1896 p. 317*) the Corporation act of 1875 and all acts amendatory thereof and supplementary thereto are repealed, with a saving of the corporate powers acquired and rights vested under the acts thus repealed.

By supplement of March 24th, 1899 (*P. L. 1899 p. 473*), section 6 of the Corporation act of 1896 was amended, but without including any authorization for the organization of companies for the purpose of diverting water from streams and storing and selling the water thus diverted.

Notwithstanding such water companies are not within the express prohibition of the proviso to section 6 of the act of 1896, either as originally enacted or as amended in 1899, it seems reasonably clear that it was not the legislative intent that the incorporation of such companies was to be permitted under those acts. The exclusion of the express authorization of such companies that resulted from the repealer of the act of 1875 and its supplements, and the express exclusion, in the act of 1896, of companies needing to possess the right to condemn lands in this state, are circumstances that point in this direction. The appellant's charter, therefore, confers no power to divert water from streams, and to sell the same, beyond the mere power to engage in "any lawful business."

45

If we were to assume, however, that the East Jersey Water Company, by obtaining a charter, under the General Corporation act of 1875 and its supplements, for the purpose of damming streams and of storing and selling water within the purview of the amendments of that act, acquired not merely the corporate capacity to do those things, but the consent of the state that they might be done to the depletion of the natural flow of the stream, so far as the state, either in its sovereign capacity or as riparian owner of the lands covered by the tidal flow of the stream at its outlet, had the power to grant such consent, and were to assume that the consent could apply to the Passaic river at Little Falls, still it seems to us that such consent could not, by any fair intendment, be deemed to authorize the depletion of our streams for the purpose of conveying water beyond the borders of this state. The act should be construed in view of the then existing circumstances, usages and practices. The transportation of water from this state to any other state was at that time unknown, save as it might be carried in bottles or other closed receptacles. It cannot be deemed that the legislature intended to confer upon any persons who desired to embark the necessary capital for the purpose the privilege of establishing an interstate aqueduct, and although the act authorizes the storage and sale of water, this, by reasonable interpretation, must be held to limit the distribution of water by pipes and aqueducts to such as is designed for the supply of the inhabitants of this state.

But could the license be deemed to have a broader scope, it was nevertheless revocable until acted upon. By the constitution of the state, as amended in 1875, article 4, section 7, *placitum* 11, corporate powers were required to be conferred by general laws, subject to repeal or alteration at the will of the legislature. And by the General Corporation act of 1875 itself (which antedated the final adoption of the constitutional amendments), it is in section 6 provided (*Rev. 1877 p. 178; 1 Gen. Stat. p. 911*) that the charter of every corporation thereafter granted by or created under any act of the legislature shall be subject to alteration, suspension and repeal, in the discretion of the legislature. As already pointed out, the repealer of the General Corporation

act of 1875 that was embodied in section 118 of the revised Corporation act of 1896 (*P. L. 1896 p. 317*), saved all the powers of existing corporations and preserved their vested rights. There is nothing to indicate that up to this time the East Jersey Water Company had entered into the business of transporting water outside of the State of New Jersey. Whether so or not, it is clear that the act of 1905, now under consideration, by its necessary effect, operated at least as a repealer of the corporate capacity to embark in any new enterprise of that kind, even if such capacity was or could be gained by a charter under the general act of 1875. And since that charter was, by the express terms of the act, repealable, no right or license that arises solely out of its terms, and that has not been acted upon, can be deemed to be beyond revocation by the legislature. *Pearsall* v. *Great Northern Railway Co., 161 U. S. 646; Galveston, &c., Railway Co.* v. *Texas, 170 U. S. 226.*

Upon the whole, therefore, it is clear that the alleged right of the appellant to transport waters outside of the state cannot be rested upon any chartered powers derived by the East Jersey Water Company under the General Corporation act of 1875 and its supplements.

Is the case for the appellant bettered by the circumstance that the East Jersey Water Company is a riparian owner upon the Passaic river? Since that company owns the intake at Little Falls, we may assume that it is a riparian owner. But it is not claimed, and the case shows no ground for the claim, that as such owner it has any property right in the flow or water of the river other than such as pertains to any other riparian owner similarly circumstanced elsewhere in the state. If we assume that it has acquired the rights of all riparian owners from the intake to the tide, still, what are the nature and extent of those rights?

In the consideration of this question, as it bears upon the case before us, it is important to keep in mind that we are dealing now only with water as it stands or flows in lakes, ponds, rivers or other streams that have a natural outlet to the sea. Such water in its natural state (so far as respects private ownership thereof) is not personal, but real property, being as much a part

of the land itself as the soil and rocks. In this aspect it is viewed by the common law, which holds that he who owns the soil owns all above it and all beneath it. But in view of the transient and flowing nature of water, the landowner's property therein is not absolute, but qualified. In a sense he owns it while it is upon his land, but his ownership is limited to a usufructuary interest, without right to divert any from its natural course, saving for the limited uses that naturally and of necessity pertain to a riparian owner, such as the supply of his domestic needs, the watering of his cattle, the irrigation of his fields, the supplying of power to his mill, and the like. This right of user is limited to so much as shall be reasonably necessary, and is qualified by the obligation to leave the stream otherwise undiminished in quantity and unimpaired in quality. The common law recognizes no right in the riparian owner, as such, to divert water from the stream in order to make merchandise of it, nor any right to transport any portion of the water from the stream to a distance for the use of others.

By the common law of England the right of diversion appears to have been confined to lands of the riparian proprietor, extending a reasonable distance from the bed of the stream. In some of the states of the union, where large portions of territory are arid and not capable of raising crops or sustaining a population without artificial irrigation, this rule has been much relaxed, but not so as to extend irrigation beyond the limits of the watershed that is naturally drained by the stream. *Chauvet* v. *Hill, 93 Cal. 407, 410; Bathgate* v. *Irvine, 126 Cal. 135, 143; Southern California Investment Co.* v. *Wilshire, 144 Cal. 68; Clark* v. *Allaman, 71 Kan. 206; 80 Pac. Rep. 571, 585.*

It will thus be seen that riparian owners, as such, have not any such right in or ownership of the waters that flow upon or past their lands as will entitle them to divert a portion of the flow and convey it elsewhere for the use of others than riparian owners. It is, indeed, often said that a riparian owner may grant to others the right to a portion of the flow, provided he do not infringe upon the rights of other riparian owners thereby. But, in strictness, no more is meant by this than that if such

grant be made the grantor and his successors in title can no longer complain of such diversion. *Stockport Waterworks Co.* v. *Potter, 3 Hurlst. & C. 300; Ormerod* v. *Todmorden Mill Co., L. R. 11 Q. B. Div. 155.* See, also, *Doremus* v. *City of Paterson, 65 N. J. Eq. (20 Dick.) 711.*

If the East Jersey Water Company, as riparian owner, had that kind of ownership of the water itself which would give it the right to make merchandise of ten million gallons per day, it might, of course, do the same with the entire flow of the river. If one riparian owner had the right to do this, the like right must pertain to each other riparian owner, as well those above as those below the works at Little Falls, and this is, of course, a manifest absurdity. Nor can the riparian owner who first takes be given a better right than the others, without establishing the rule of "prior appropriation." Such a rule was established by act of congress of July 26th, 1866, with respect to certain lands in the mining states of the west, for reasons explained in *Jannison* v. *Kirk, 98 U. S. 453.* Any such rule is foreign to the common law, whose maxim is *"aqua currit, et currere debet, ut currebat."*

We are referred to the language of Mr. Justice Depue (afterwards chief-justice), speaking for the supreme court, in *Cobb* v. *Davenport, 32 N. J. Law (3 Vr.) 369* (at *p. 378*), where he said: "By the common law all waters are divided into public waters and private waters. In the former the proprietorship is in the sovereign; in the latter in the individual proprietor. The title of the sovereign being in trust for the benefit of the public, the use, which includes the right of fishing and of navigation, is common. The title of the individual, being personal in him, is exclusive—subject only to a servitude in the public for purposes of navigation if the waters are navigable in fact." Upon the strength of this it is contended by counsel for the appellant that it was intended to be held by the supreme court that the title of the individual riparian owner to the water itself—the fluid considered as a commodity—is exclusive against the public and against all persons except other riparian owners. An examination of the context, however, shows that nothing of the

sort was intended. The question at issue was whether the land covered by Green pond, an inland lake having a navigable depth but no navigable outlet, and entirely remote from the flow of the tide, was in the plaintiff, who claimed title thereto under grants from the board. of proprietors, or whether it was in the public, so that the plaintiff could not exclude the defendant from fishing upon the lake. What was meant by the language quoted is that in *lands covered by private waters* (and the case properly applied the tidal test as distinguishing public from private waters) exclusive title was originally in the boards of proprietors and could be conveyed by them to individuals.

That the interest of the riparian owner in the water is confined to the usufruct is clearly set forth in *Higgins* v. *Flemington Water Co., 36 N. J. Eq. (9 Stew.) 538.*

Excluding, therefore, all the customary and lawful uses by means of which· a riparian owner may properly diminish the flow of a stream, what private ownership remains in the residue? His right of ownership, manifestly, is the right simply to have the flow continue—a valuable right, truly, but a right that partakes solely of the nature of realty, being, from the nature of things, inseparably annexed to the land itself.

We may concede, for the purposes of the present discussion, that a landholder may acquire an absolute private title to water, as water, by employing artificial means to intercept it as it falls in rain from the clouds, thus preventing it from reaching the natural streams. (See dissenting opinion of Justice Field, in *Spring Valley Water Works* v. *Schottler, 110 U. S. 373.*) We may concede, also, for present purposes, that subterranean waters, such as may be reached only by driving wells, when thus acquired, become absolutely the property of the proprietor of the soil, and may be dealt with by him as merchandise, and that if they be thus converted into a merchantable commodity the state would not be permitted to prohibit its transportation beyond the confines of the state. Water thus taken from wells may be placed on the same plane with oil and natural gas, concerning the latter of which it was held, by the supreme court of Indiana, in *State, ex rel. Corwin,* v. *Indiana and Ohio Oil, &c., Co., 120 Ind. 575,*

that the state could not constitutionally prohibit its transportation beyond the confines of the state.

The act of 1905 deals only with fresh water running in the natural streams and in lakes and ponds that have their outlets in natural streams. The decree under review, likewise, deals alone with water of this character. The common law recognizes no right of private ownership therein except to a limited extent by the riparian owners.

And since the exercise of all rights of private ownership by all riparian owners still leaves the stream to remain as a running stream, there remains a *residuum* of common or public ownership that under our system rests in the state as a trustee for all the people. Blackstone says:

"Water is a movable, wandering thing, and must, of necessity, continue common by the law of nature; so that I can have only a temporary, transient, usufructuary property therein." *2 Black. Com. 18.*

And in *Cobb* v. *Davenport, 32 N. J. Law (3 Vr.),* at *p. 378,* Justice Depue said: "The policy of the common law is to assign to everything capable of ownership a certain and determinate owner. \* \* \* If capable of occupancy and susceptible of private ownership and enjoyment, the common law makes it exclusively the subject of private ownership; but if such private ownership and enjoyment are inconsistent with the nature of the property, the title is in the sovereign, as trustee for the public, holding it for common use and benefit."

What the learned justice proceeded to say to the effect that in this state non-tidal waters are private, not public, had reference, as already shown, to the right of fishing, and was not intended to assert a complete private ownership in the water as water.

Such private title as may be acquired in water, the liquid, when separated from its natural bed, may, for convenience, be described as a title by occupancy, and the question remains, how far does the law authorize the acquisition of such a title? As already shown, the common law authorizes its acquisition only by riparian owners, and for purposes narrowly limited. Beyond that the ownership is common and public.

The present case is closely parallel to *Geer* v. *Connecticut, 161 U. S. 519,* where the supreme court of the United States held that a state law prohibiting game killed within the state from being transported beyond its borders did no violence to the interstate commerce clause of the federal constitution, the decision being put upon the ground that by the common law wild game is subject to governmental control; that the state might exercise its control in such manner as to confine the use of it to the people of that state; that although the statute under consideration permitted the killing of game, and its sale within the state, yet the prohibition against exportation entered into every such transaction of sale, and rendered it strictly internal commerce; that the state in granting to its residents the right to kill game had lawful authority to impose a condition prohibiting its exportation, and that in the face of such a prohibition the game killed did not become the subject of interstate commerce.

Upon the argument here an attempt was made to distinguish this decision upon the ground that it turned upon the ownership of game by the state as successor to the king's prerogative. An examination of Justice White's opinion, however, shows that he based the king's prerogative and the state's right of control alike upon the fact that game was public property because not susceptible of absolute private ownership by anybody. Hence is derived the doctrine that control resides in the state, not as a proprietor, but in its sovereign capacity as representative and for the benefit of all the people in common. Water, the liquid, in its natural state, is as fugitive in character as game, and as little susceptible to private ownership.

And so the riparian owner, as such, has no common-law right to make merchandise of the water that otherwise would naturally flow to the sea.

But it is argued, in effect, that in this state we have by statute departed from the common law in this regard, and have authorized riparian owners and others to make general merchandise of the water of our lakes and streams. No doubt if such were the general policy of our statute laws, it would not be competent for

the legislature to prohibit the exportation of such merchandise beyond the state. But no statute to this effect is cited, and we know of none.

From the organization of the state government until the constitutional amendments of 1875 which prohibited special laws for the purpose, many special charters were granted by the legislature conferring corporate powers that included the right to divert and use the waters of lakes, ponds and streams for purposes of power, for purposes of artificial navigation, and for the purpose of supplying cities and towns of the state with water for consumption. In most, although not in all, of these special charters there was no grant of the right to interfere with the natural course of the water other than such as may be implied from the grant of corporate powers that could not be exercised without the diversion of water from its natural courses and the expenditure of money by the corporators in the development of the various enterprises thus chartered. In a few cases the grants of water rights were more explicit, as witness the charter of the Society for the Establishment of Useful Manufactures, passed November 22d, 1791 (*P. L. 1791 p. 730 § 17*) ; the act to develop and improve the water power of the Passaic river, approved March 30th, 1868 (*P. L. 1868 p. 545 § 1, &c.*), which confers further powers upon the same society; the charter of the Morris Canal and Banking Company, passed December 31st, 1824 (*P. L. 1824 p. 158 §§ 5, 11, &c.*) ; the charter of the Delaware and Raritan Canal Company, passed in 1830 (*P. L. 1830 p. 75 § 11*).

Shortly after the constitutional amendments of 1875, the legislature passed two general laws, one for the organization of private corporations for the purpose of supplying municipalities with water (*P. L. 1876 p. 318; Rev. 1877 p. 1365; 2 Gen. Stat. p. 2199*), and the other authorizing cities to establish works of their own (*P. L. 1876 p. 336; Rev. 1877 p. 720; 1 Gen. Stat. p. 646*). Since then numerous other general acts have been passed looking to the supply of our various municipalities with water. Reference has already been made to the several supplements to the Corporation act of 1875 that dealt with the damming of streams and the storage and sale of water. These supplements have been repealed. *P. L. 1896 p. 317 § 118.*

Conceding all that may reasonably be claimed to be the effect of these various enactments, and others of like character, they do not evince any legislative policy to make the waters of our lakes and streams the subject of general merchandise, nor indeed of merchandise at all in any proper sense. The water that is diverted from a stream into an artificial canal for navigation does not become the subject of commerce. Water that is withdrawn for power purposes returns shortly to the natural bed. That which is withdrawn for the supply of municipalities shortly re-enters the common stock of the state. In a limited sense it may become for a time personal property, and to a limited extent be made the subject of barter and sale, but only for public purposes pertaining to the welfare of our own citizens, who, by the very fact of residence within our borders, have a prior claim upon such natural advantages as pertain to our territory. Any grant of the power of eminent domain is by the constitution limited to public uses, and the withdrawal of water from a stream in order to make general merchandise of it could hardly be deemed a public use. All our legislative grants (express or implied) of the right to divert water for other than the common-law riparian uses have been contained in corporate charters, general or special. The special charters are all, by fair intendment, confined to purposes that are of necessity limited to the territory of this state. The broadest charter for purposes of water diversion that could at any time be acquired under our general laws is such an one as we have above assumed to be possessed by the East Jersey Water Company. Its utmost scope and its limitations have already been indicated.

There is, in all of this legislation, no general purpose, much less any specific enactment, that changes the rule of the common law so as to make the water of our streams and lakes the subject-matter of commerce in the ordinary sense. Nor was anything of this kind intended to be intimated in *New Jersey Suburban Water Co.* v. *Harrison, 72 N. J. Law (43 Vr.) 194, 195,* where it was said: "There was evidence that the water in question had become a commodity, and had been bought and paid for by the water company." This water had been acquired from the

East Jersey Water Company for the supply of one of the munici-palities of this state. It was, at the most, converted into per-sonal property for that limited purpose, but while in the dis-tributing pipes was not the subject of commerce in the general sense.

It is suggested that where the legislature authorizes a munici-pality or a water company to sell and dispose of water to private consumers, the consumer may put the water into bottles or other receptacles and sell it abroad in the market. For present pur-poses this may be fully conceded, and we may assume (without conceding) that the state may not limit commerce in the bottled water to its own citizens. The statute under review imposes no such limitation, its prohibition being confined to the transporta-tion of water without the state by means of pipes, canals, and the like. Whether the legislature, while authorizing the diver-sion of water from the streams for municipal purposes, might not at the same time entirely prohibit its being bottled for sale, is quite a different question, concerning which no intimation is intended.

It is said that neither the act of May 11th, 1905, nor the information of the attorney-general seeks to prevent the diver-sion of water from the stream, but only its transportation into another state for use therein. A sufficient answer to this is that the legislature may well have confined its prohibition to that which required to be prohibited, and that the information of the attorney-general is exhibited to prevent a specific infraction of the law, and need not concern itself with other matters.

Implicit in the argument, however, is the suggestion that the absence of statutory prohibition against the diversion of river waters, saving where the water is intended for transportation out of the state, amounts to a legislative recognition of the right of riparian owners, and perhaps of others, to divert water from the streams at their will so long as it is disposed of within the state. To this argument we cannot yield our assent. The pro-hibition of artificial channels to lead our fresh waters out of the state does not at all imply a general license to divert waters pro-vided they be used within the state. As we have just pointed

out, it is, and long has been, the legislative policy of this state, while recognizing fully the common-law right of diversion on the part of riparian owners, to allow no statutory extension of this right, nor to authorize water diversion for other than riparian uses, saving for a limited·class of purposes beneficial to the people of this state, such as the establishment of water powers for manufacturing purposes, the construction of artificial channels for navigation, and the supply of our own inhabitants with water through aqueducts.

So far from sanctioning any general commerce in water, our legislative policy has been and is to preserve and administer our water rights for the benefit of our own people, to whom, by right of proximity and sovereignty, they naturally belong. A recent instance is to be found in *P. L. 1905 p. 200 § 3*, whereby the power of the flood commissioners to be appointed under *P. L. 1904 p. 518* is limited so that they shall have no power to sell or divert water beyond the state limits.

Throughout the whole of the argument for the appellant it is suggested, rather than distinctly urged, that the people of the neighboring State of New York have a natural right to the use of the waters of New Jersey if such use can be gained without impairing the rights of individual riparian owners upon our streams. It is said that the appellant purposes to take only the surplus water of the Passaic that is of no particular benefit to anyone while running in a natural state, and the impression is sought to be conveyed that the people of New Jersey have no lawful power to interfere with what is called the natural right of the people of New York to gain a water-supply from this source. Counsel indeed assails the act of 1905 as "a most unreasonable and unneighborly piece of legislation, highly discreditable to the state." Such epithets are of no service in a judicial tribunal. If the act under consideration be impolitic, arguments to that effect may well be addressed to the lawmaking body, but are out of place here.

Whether the proposed diversion of the appellant is material in quantity is a question that may receive consideration in its proper order. At this point we are concerned particularly in

denying that the State of New York or the citizens thereof have any inherent right to withdraw a supply of water from the territory of New Jersey by artificial means.

In this aspect the case for the appellant can stand certainly on no higher ground than the people of New York themselves would occupy if in their sovereign capacity they were asserting similar rights in the courts. Stripped of all circumlocution, what is asserted is the right of the people of New York to derive an artificial water-supply from the territory of New Jersey without the consent of the people of this state. This argument, however, is at once overthrown by reference to the established principle that one state cannot expropriate for its public purposes property within the territory of another state. *Rand. Em. Dom.* § *28,* citing *Crosby* v. *Hanover, 36 N. H. 404, 423; State* v. *Boston, Concord and Montreal Railroad Co., 25 Vt. 433, 444; Saunders* v. *Bluefield Water Works, &c., Co., 58 Fed. Rep. 133, 136;* see, also, *10 Am. & Eng. Encycl. L. (2d ed.) 1051; Holyoke Water Power Co.* v. *Connecticut River Co., 52 Conn. 570, 575.*

To admit that the people of the State of New York have any inherent right to gain a water-supply from the lakes or streams of New Jersey by means of an artificial aqueduct constructed for the purpose is to assert that the sovereignty of New York extends to some extent and for some purposes over the soil of New Jersey. To state the proposition is to refute it. Such interstate rights can be acquired only by interstate compact.

We have been privileged to see in print an opinion recently submitted to the Merchants' Association of New York by Mr. Randolph, author of the well-known work on eminent domain, upon the question of an interstate water-supply for that city. Referring to "that interest in water which each state possesses as the guardian of its community," he says:

"I think it is clear that the right of an individual or a corporation to divert water, whether gained by public grant or by prior appropriation, is presumed to be utilized within the state, which may forbid the carriage of the water beyond its bounds."

Again he uses this language:

"And when we point out that each state holds all the property in its territory free from the eminent domain of another, and cannot be compelled to surrender its property to another in any way, I think we approximate the irreducible measure of sovereignty in this relation."

It will, of course, be observed that the case before us is not at all parallel to the case that would be presented were the State of New Jersey or citizens thereof setting up a right to interfere with a flow of water that otherwise would, in its natural course, reach the territory of a neighboring state. Such a case was presented in *New York City* v. *Pine, 185 U. S. 93.* There the city of New York constructed a dam on the west branch of Byram river, within the State of New York, this being a non-navigable stream of fresh water arising in New York, flowing thence through the State of Connecticut, and emptying into Long Island sound. The plaintiffs were riparian owners of land in the State of Connecticut, and brought action in the federal circuit court for an injunction to restrain the city from diverting the waters of the west branch from their natural flow through the plaintiffs' lands. The supreme court assumed, without deciding, that although the west branch above the dam and all the sources of supply of water to that branch are within the limits of the State of New York, that state has no power to appropriate such water or prevent its natural flow through its customary channel into the State of Connecticut. The injunction was denied, however, and the right of the plaintiffs to pecuniary compensation established in its stead, on the ground of their acquiescence in the construction of the works by means of which the diversion was to be effected. In the great case of *Kansas* v. *Colorado, 185 U. S. 125* (decided on demurrer, but not yet determined on final hearing), the State of Kansas, partly on the basis of its ownership of riparian lands upon the Arkansas river and partly in the right of its citizens who are riparian owners thereon, is seeking to enjoin the State of Colorado from withdrawing from the river for irrigation of the arid lands of Colorado so much of the waters of the river as to materially injure the riparian lands in

NOVEMBER TERM, 1905.          719

*4 Robbins.*   McCarter, Att'y-Gen., *v.* Hudson County Water Co.

Kansas. A demurrer to the bill was overruled on the ground that in a case of so great importance a determination of the questions involved ought to be left until the facts were established by proofs. Impliedly the right to prevent an undue interference with the natural flow of the river was recognized.

But whatever recognition these two important decisions imply of the right of one state to prevent another state from interfering with the natural flow of a river in which the complaining state has an interest, is directly opposed to the contention of the appellant here, for what it is asserting, in effect, is the right of citizens of the State of New York to interfere with the natural flow of one of the rivers of New Jersey, without the consent and contrary to the express prohibition of the people of the latter state.

In our opinion, therefore, the legislature may prohibit the abstraction from the lakes, ponds and streams of the state of waters to be used for any other purpose than to meet the lawful uses of riparian owners (saving, of course, other rights vested under grants already made), and when the legislature has forbidden its abstraction for a stated purpose not within such uses, abstraction for that purpose becomes unlawful, and may be restrained at the instance of the attorney-general.

The act of 1905 forbids its abstraction by canals or conduits for transportation beyond the state. This is not in violation of the interstate commerce clause of the federal constitution, because until the water is lawfully abstracted it does not become the subject of legitimate commerce. *Ames* v. *Kirby,* 71 *N. J. Law* (42 *Vr.*) 442. The state having power to prohibit the diversion of the water from the lakes and streams for transportation beyond the state, the prohibition is a condition imposed upon its diversion, and so the water diverted cannot legitimately enter into interstate commerce. *Geer* v. *Connecticut,* 161 *U. S.* 519, 530.

The act of 1905 is thus vindicated as a legitimate exercise of the sovereignty of this state, not interfering with private property rights, with the rights of citizens of the other states, nor with interstate commerce.

It must not be forgotten, however, that the State of New Jersey is itself a riparian owner upon the Passaic river below the intake of the East Jersey Water Company. The state owns the bed of the stream where flowed by the tide, saving so far as it may have made grants to private owners. The state, therefore, has a proprietary right to the continued flow of the stream which is paramount to the rights of the upper riparian owners to withdraw water for purposes other than those incident to riparian ownership. For this additional reason the state, in its sovereign capacity, may prohibit any extraordinary diversion, such as would be occasioned by withdrawing water from the river by means of artificial canals or pipes for the purpose of conducting it out of the state.

It is no answer to say that the abstraction of the entire flow of the Passaic would not lower the *level* of the water that covers the state's land, which, as asserted, is governed by the level of the sea. The assertion is not accurate, for, of course, the downward flow of the river combines with the flow of the tide to determine the water-level at the mouth of the river, and for a long distance above its mouth. But aside from this question, the state, as riparian owner, is interested in the *quality* of the water that flows upon its land.

In the face of an express statutory prohibition, resort cannot be had to the maxim *de minimis*. It is for the lawmaking power to determine whether the amount of water proposed to be abstracted is so slight that it ought to be disregarded, and it is within the competency of the legislature to determine, as they have done in this act, that the diversion shall be absolutely prohibited. A similar question was presented in *State Board of Health* v. *Diamond Mills Paper Co., 63 N. J. Eq. (18 Dick.) 111; affirmed, 64 N. J. Eq. (19 Dick.) 798.* There a statute prohibited the discharge of polluting material into any stream from which municipalities receive a water-supply for domestic uses above their point of intake, and authorized the state board of health to institute an action in the court of chancery to enjoin the continuance of such pollution. It was contended that the pollution proved did not affect the water of the stream beyond a short dis-

tance from the point of pollution, and the proofs did not show that the water-supply of any municipality was in fact polluted. But Vice-Chancellor Stevens held, in effect, that in the face of the legislation the amount of pollution was immaterial. His decision was affirmed by this court for the reasons given by him.

We must not be understood, however, as intimating that the mischief at which the act of 1905 is aimed is trifling or unsubstantial, nor that the diversion proposed by the appellant is of no present practical moment. The amount proposed to be presently diverted is a material part of the dry-weather flow of the Passaic at Little Falls. Comparisons between this amount and the volume of the river in times of flood are not of the slightest value. Nor can it be properly said that when the river runs unobstructed to the sea, its water, either in time of drought or in time of flood, is "wasted" in any general sense. It carries off polluting material (see the practical situation disclosed in *Simmons* v. *Paterson, 60 N. J. Eq. (15 Dick.) 385,* and *Van Cleve* v. *Passaic Valley Sewerage Commissioners, 71 N. J. Law (42 Vr.) 201, &c.*), it fructifies the soil, and performs the other normal functions of a fresh-water stream. The withdrawal of three million to ten million gallons per day is not a matter that may be treated as of little consequence. If the decree under review were to be justified only by resort to the police power, and if it interfered with any property rights of the appellant, it might be necessary to show a substantial present necessity for such interference. Such, however, is not the case.

The act of 1905 looks not only to the present, but to the future. It recognizes that the growth and prosperity of the state depend not alone upon the advantages that it presently affords, but upon the assurance that the like advantages, to the extent of our natural resources, properly conserved, will remain for posterity. This policy of foresight, and the desire to foreclose in advance any claim of a vested right to transport the waters of our lakes and streams beyond the borders of the state, doubtless entered into the motive of the legislature in imposing a present prohibition.

We find it unnecessary to discuss the grounds upon which the

46

learned vice-chancellor based his conclusions, aside from the act of 1905.

The decree under review should be affirmed, with costs.

*For reversal*—None.