224 N.J. Super. 53 (1987)
539 A.2d 760
MAYOR AND MUNICIPAL COUNCIL OF THE CITY OF CLIFTON, A MUNICIPAL CORPORATION AND SUBDIVISION OF THE STATE OF NEW JERSEY, AND JOSEPH J. LYNN, SR., PLAINTIFFS,
v.
PASSAIC VALLEY WATER COMMISSION, A BODY POLITIC AND SUBDIVISION OF THE STATE OF NEW JERSEY, CITY OF PATERSON AND CITY OF PASSAIC, DEFENDANTS.
SENATOR JOSEPH BUBBA, MAYOR SAMUEL CHERBA AND ASSEMBLYMAN GERALD ZECKER, PLAINTIFFS,
v.
PASSAIC VALLEY WATER COMMISSION, A BODY POLITIC AND SUBDIVISION OF THE STATE OF NEW JERSEY, DEFENDANTS.
MAYOR AND MUNICIPAL COUNCIL OF THE BOROUGH OF NORTH ARLINGTON, A MUNICIPAL CORPORATION AND SUBDIVISION OF THE STATE OF NEW JERSEY; ROBERT LANDOLFI, PLAINTIFFS,
v.
PASSAIC VALLEY WATER COMMISSION, A BODY POLITIC AND SUBDIVISION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division Passaic County.
Decided July 21, 1987.
*56 Sam Monchak for plaintiffs Mayor and Municipal Council of the City of Clifton and Joseph J. Lynn, Sr.
Patrick J. Caserta for plaintiffs Senator Joseph Bubba, Mayor Samuel Cherba and Assemblyman Gerald Zecker.
Mark C. Curtis for plaintiffs Mayor and Municipal Council of the Borough of North Arlington, and Robert Landolfi (Edwin C. Eastwood, attorney).
William J. Rosenberg for defendant Passaic Valley Water Commission.
Susan E. Champion for defendant City of Paterson (Ralph J. DeLuccia, Jr., attorney).
John J. McKniff for defendant City of Passaic.
SAUNDERS, J.S.C.
This consolidated action in lieu of prerogative writs is brought by various plaintiffs against the Passaic Valley Water Commission and two of its owner municipalities, Paterson and Passaic. All plaintiffs challenge a resolution of the Passaic Valley Water Commission (Commission), distributing $500,000 from "surplus" to the three owner cities. Additionally, the City of Clifton as a third owner city, seeks to declare as invalid, paragraph 13 of the 1931 agreement between the cities insofar as it fixes the percentage of ownership among the cities at the ratio established by the 1929 tax assessment level of the municipalities.

I.

Case History.
Suit was originally brought by Clifton and Joseph J. Lynn, Sr. (City Manager) against defendant Commission. The court entered an order requiring that all municipal customers of the Commission be joined as plaintiffs in the litigation or as defendants. R. 4:28-1(a). Thereafter, a second suit was filed by *57 Senator Joseph Bubba, Mayor Samuel Cherba and Assemblyman Gerald Zecker, and a third suit brought by the Borough of North Arlington and Robert Landolfi. A number of other municipalities entered appearances or filed answers, but eventually all withdrew from active participation and agreed to be bound by the litigation.[1]

II.

Findings of Fact.
In 1923, the Legislature authorized two or more municipalities to acquire privately owned water works which supplied water to the municipalities. N.J.S.A. 40:62-108 et seq. The governing bodies of Paterson, Passaic and Clifton applied to Justice Black of the Supreme Court for the appointment of a commission to acquire the water works and distribution system of the Passaic Consolidated Water Company. This company served all of Paterson and Passaic and a portion of Clifton. The portion of Clifton not served directly by the water company was served by a distribution system constructed and operated by Clifton and supplied water purchased from the water company. Clifton v. Passaic Valley Water Commission, 59 N.J. Super. 87, 90 (Ch.Div. 1960). After the water works was acquired by condemnation, the three cities entered into an agreement dated February 3, 1931 (1931 agreement). See N.J.S.A. 40:62-129. Paragraph 13 of that agreement is the subject matter of this litigation.
13. Reports shall be made to the respective cities quarterly on the first days of March, June, September, and December in each year which shall contain a detailed statement of the operation of the water works and any other information of value to the Cities. The Commission shall transmit all moneys in their hands acquired from such operation beyond what is necessary to meet its obligations, to the TREASURER of the respective Cities in proportion to their *58 ownership in said water works, that is to say, in the proportion that the assessed valuation for taxation of all real estate of each of said Cities for the year Nineteen Hundred and Twenty-Nine, bears to the total assessed valuation for said year of all the real estate in all said Cities.
This paragraph, in effect, fixed the approximate percentage of ownership of the Commission by the cities as Paterson 4/7ths, Passaic 2/7ths and Clifton 1/7th[2].
In 1931, Clifton was generally considered a rural community while Paterson and Passaic were urbanized industrialized cities. Over the past 50 years, the population of the cities has changed somewhat.

 POPULATION.[3]
Year Paterson Passaic Clifton
1930 138,153 62,959 46,875
1940 139,656 61,394 48,827
1950 139,336 57,702 64,511
1980 137,970 52,463 74,388

The ratio of the assessed valuation of real property in the respective cities has changed dramatically over the past 50 years.

*59
 ASSESSED VALUATION OF REAL
 PROPERTY.[4]
Year Paterson Passaic Clifton
1929 183,111,610 84,331,875 41,941,270
1940 150,238,455 70,071,575 45,915,575
1986 261,032,600 613,279,519 1,177,432,700

As among the three owner cities, their residents purchased and used water in the following percentages for 1986:

 Percentage
 Paterson 48
 Passaic 20
 Clifton 32

As between the three owner cities and all users of water purchased from the Commission, the percentages for the year 1986 were:

three owner cities (Paterson, Passaic, Clifton) 63 1/2%
all other users (20 municipalities) 36 1/2%

Although the 1931 agreement permitted distribution of "all moneys in their hands acquired from such operation beyond what is necessary to meet its obligations, to the TREASURER of the respective cities in proportion to their ownership in said water works, that is to say, in the proportion that the assessed valuation for taxation of all real estate of each of said Cities for the year Nineteen Hundred and Twenty-Nine, bears to the total assessed valuation for said year of all the real estate in all said cities," no distributions were made for the first 20 years of its existence. Thereafter, distributions were made as follows:

 1952 - $150,000
 1953 - $125,000
 1957 - $100,000
 1962 - $350,000
 1984 - $700,000
 1985 - $375,000
 1986 - $500,000

*60 The Commission, by resolution dated April 9, 1986,[5] authorized the distribution of "surplus" funds from 1985 in the amount of $500,000 which was allocated as follows:

 Paterson - $296,050
 Passaic - $136,250
 Clifton - $ 67,700

In the past three years, the Commission has distributed a total of $1,575,000 to its owner cities as follows:

 Paterson - $932,557.50
 Passaic - $429,187.50
 Clifton - $213,255.00

Wendell Inoffer, General Superintendent and Chief Engineer testified that the commissioners initially discussed a distribution of $2,000,000. This discussion was first raised by Commissioner Karaszegi of Passaic.[6] At the request of the Commissioners, Comptroller James Egan distributed an interoffice memo dated March 7, 1986 entitled "Allocation of 12/31/85 Current Funds." This memo, while showing available current funds in excess of $6,500,000, estimated projected 1986 budget losses of over $4,000,000 with other liability and contingent liability of almost $4,000,000. The report showed a negative total with a projected loss of $1,250,000. The report also reflected a projected loss in the 1987 budget of approximately $2,500,000.
Notwithstanding that memo from the comptroller and the opposition of Inhoffer, Commissioner Karaszegi on March 26, 1986 introduced a resolution to distribute $2,000,000 from "surplus" to the owner cities. That resolution was not seconded *61 and Commissioner Karaszegi declared "I think it is a sad day for all taxpayers of the owner cities...." He then went on to say "we are at a time when we see our own cities' tax rates being increased ... and it is unfortunate that some have chosen not to allow these dividends to go back to the owner cities."
When the resolution was not seconded, Commissioner Pasquariello representing Paterson proposed a meeting with the mayor and other representatives of Paterson and the representatives of Clifton. He also recommended an independent auditor be hired to review the question of "surplus." The commission did hire Bowman & Company of Collingswood, New Jersey for this purpose. That company subsequently submitted a report and arrived at several conclusions. "Based on our review, the projected operating deficit appears reasonable and probable.... Therefore, if the projected $4.2 Million deficit for 1986 is followed by an equally reasonable deficit of $2.1 Million in 1987, such deficit will be absorbed by virtually all of `consumable' surpluses and `available' cash at December 31, 1985. However, this `draining' of the Commission's funds could create a financial hardship." The report went on to state "inasmuch as the Water Commission has an operating deficit of $1.2 Million for the seven months ended July 31, 1986; the actual figures seemed to be running parallel to the projections." The report went on to conclude "Inasmuch as the projected deficits could exhaust any consumable surpluses and available cash at December 31, 1985, deferral of a rate increase too far from the immediate future may be overly prudent." Comptroller Egan testified that he agreed with the Bowman report and found that it was substantially in agreement with his March 7, 1986 interoffice memo.
A meeting was held at the Commission offices with the mayors of Passaic and Paterson and representatives from Clifton. At that meeting, Mayor Lipari suggested that a distribution of $6,000,000 could be made. Subsequently, the proposed distribution was reduced to the sum of $500,000 and approved *62 by the adoption of a resolution dated April 9, 1986.[7] Inhoffer advised the Commission that he "could live with it." Comptroller Egan testified that he was not asked his opinion or recommendation and that he did not endorse the distribution of $500,000. He testified that his interoffice memo of March 1986 should not be considered as such an endorsement. Inhoffer testified that the Commission wanted a distribution small enough so as not to hurt the Commission and large enough to give maximum benefit to the cities. He said that the distribution was helpful to the Commission because it shows the cities that the Commission has compassion for the cities' financial problems.
James Egan has been the comptroller of the Commission for 26 years. He is a C.P.A. with a certificate as a municipal financial officer and is the chief financial officer for the Commission. He testified that the operation of the Commission has never cost the owner cities any money. The Commission's budget is not submitted to any agency for approval, nor are the water rates established by the Commission subject to approval or review by any agency.
He understands the 1931 agreement to require the Commission to be on a calendar year basis for accounting. Notwithstanding the 1931 agreement, the Commission adopted a report submitted by Havens & Emerson, dated September 6, 1984, which recommended that the Commission proceed on a five-year cycle starting 1985. The Havens report recommended that water rates be raised in the first two years of the cycle so as to generate a surplus capable of offsetting the projected losses which were to be incurred in the last two years of the cycle. The middle or third year was projected to be self-supporting. The projections did not contemplate a distribution of money to *63 the owner cities. The Commission adopted the recommendation and began the five-year plan in 1985.
Notwithstanding the theory of that plan and a 15 1/2% water rate increase, the Commission had an operating loss of over $200,000 in 1985 and over $1,300,000 in 1986. Comptroller Egan testified that, in his opinion, the distribution of $500,000 was premature under the five-year plan and contrary to the intent of paragraph 13 of the 1931 agreement. He further testified that the $500,000 distribution did not come out of surplus from the year 1985 or 1986 since those years had operating losses. It came from the "retained earnings account." The Commission never asked Egan if "surplus" was available for the distribution. He testified that if asked, he would have reminded them of the five-year plan.
Edward Routel, Chief Financial Officer for Passaic agrees that there was no surplus at the end of 1985 or 1986, but that a distribution could be made out of retained earnings and would not hurt the Commission. This expert admittedly had not read paragraph 13 of the 1931 agreement. Three commissioners and other experts testified that they used the term "surplus" and "retained earnings" interchangeably. Notwithstanding their use of the terms, all agree that surplus is "income over expenditures" and retained earnings is "an accumulation of surplus from prior years."
Frederick Ebenau, Director of Finance for the City of Paterson admitted on cross-examination that the distribution of $500,000 was inconsistent with the Commission's five-year plan.

III.

Distribution of $500,000.

A.

Public Trust and Statutory Authority.
Water is an essential commodity which all of nature requires for survival. Our food supply is derived through water which *64 combines with nutrients and minerals to form the fruits and vegetables which become part of our daily diet. The plants of the soil, nurtured by water and consumed by animals, provide our main staple of meat. Like the plants and animals, we too must be nurtured by water.
Potable water, then, is an essential commodity which every individual requires in order to sustain human existence. Frequently, residents in rural areas have individual wells and thus become somewhat self-sufficient and independent with respect to their water supply. However, residents in urban and suburban areas are dependent upon the agency or institution which supplies potable water.
While the original purpose of the public trust doctrine was to preserve the use of the public natural water for navigation, commerce and fishing, Arnold v. Munday, 6 N.J.L. 1, 69-78 (Sup.Ct. 1821), it is clear that since water is essential for human life, the public trust doctrine applies with equal impact upon the control of our drinking water reserves. The Supreme Court has determined that "It is appropriate to consider the unique nature of water." K.S.B. Tech. Sales v. No. Jersey Dist. Water Supply, 75 N.J. 272 (1977). Ultimate ownership rests in the people and this precious natural resource is held by the state in trust for the public benefit. Borough of Neptune City v. Borough of Avon-by-the-Sea, 61 N.J. 296 (1972).
The Commission was established pursuant to N.J.S.A. 40:62-108 et seq. The legislative history reveals that original Assembly Bill 309 (introduced February 6, 1923) had a statement attached which stated in part "A very serious situation exists in 26 municipalities in this state, which requires prompt action to avoid a water famine." The state Legislature has previously determined that "adequate supplies of wholesome water are essential to the health, welfare, commerce and prosperity of the people of the state." N.J.S.A. 58:22-2(a). "The legislature finds and declares that it is a paramount policy of the state to protect the purity of the water we drink ...; that the maintenance *65 of high-quality potable water is essential in order to safeguard the health and welfare of the people of the state...." N.J.S.A. 58:12A-2.
It is clear that the broad doctrine acknowledging the public nature of the resource pertains to the water gathered and distributed by the Commission. It belongs to, and is for the common use of, the public, and those who take it into their possession hold it in trust for the public good. The purpose and function of the Commission can only be to provide water of the highest quality at the lowest economically feasible cost. Funds derived from the sale of such water are held in trust for the benefit of the public which is being served.
While the Legislature may give the Commission the right to construct facilities for the collecting, holding and distribution of water, it did not relinquish the public interest in this common property, nor reduce the trust imposed upon the Commission to hold, protect and manage their facility for the benefit of the public it serves.
As Judge (now Justice) Handler said in State v. No. Jersey Dist. Water Supply, 127 N.J. Super. 251 (App.Div. 1974)
This controversy must be understood in the perspective of the State's overriding concern and obligation to safeguard the public health. [Citation omitted] This encompasses a comprehensive power, coupled with a correlative duty, to control and conserve the use of its water resources for the benefit of all its inhabitants. [Citation omitted] It is a paramount governmental policy that such water supplies must be pure in quality, and be economically and prudently managed for the benefit of the public. [Citation omitted] Designed to protect and promote the general health, safety and welfare, statutes regulating public water resources must be liberally construed to advance and achieve this underlying beneficient policy. [Id. at 260; citation omitted]
What Justice Mountain (then sitting in the Chancery Division) in No. Jersey Dist. Water Supply Comm. v. Newark, 103 N.J. Super. 542 (Ch. Div. 1968), aff'd 52 N.J. 134 (1968) said of that Commission applies equally to the Passaic Valley Water Commission. "It is, of course, clear that the North Jersey District Water Supply Commission is not a private corporation seeking to make a profit. It is a public body, politic and *66 corporate, exercising public and essential government functions in the interest of the public health and welfare." 103 N.J. Super. at 549.
The Commission must operate for the benefit of the public it serves and not for the purpose of collecting profits or surplus for distribution to the owner cities as subsidies for their tax rates. The powers of the Commission are derived from the statute creating it. It cannot obtain rights, privileges and powers from an agreement made by its owner cities unless those rights, privileges and powers are derived from the enabling legislation.
The 1931 agreement has its genesis in N.J.S.A. 40:62-129. That statute permits an agreement prescribing a method of appointing a commission and its officials with the method of appointment, term of office, etc. It also may provide "such other provisions as may be necessary for the maintenance and efficient operation of such water works, the extension and enlargement thereof and the proper management of its financial affairs...." N.J.S.A. 40:62-127 provides in part "rates shall be prescribed ... so that the water works shall be self-supporting, the earnings to be sufficient to provide for all expenses of operation and maintenance and such charges as interest, sinking fund and amortization so as to prevent any deficit to be paid by taxation from accruing."
The Commission is a body, both corporate and politic created by three cities pursuant to statute. It derives its power and authority to act solely from statute. The statutory powers of the Commission are to be strictly construed and any doubt or ambiguity is to be resolved against it. See Driscoll v. Burlington-Bristol Bridge Co. 8 N.J. 433, 490 (1952), cert. den. 344 U.S. 888, 73 S.Ct. 181, 97 L.Ed. 687. An examination of the statute fails to disclose any provision from which it reasonably can be inferred that the Commission has the right or the power to operate the water works for profit or to distribute "surplus" funds. The concept of profit is anathema to the public interest. *67 The distribution was of no benefit to the Commission or to the 20 municipalities who purchase over 36% of the water sold by the Commission. The only beneficiaries are the three owner cities who use the distribution to reduce their local tax rates. In essence, the residents of the customer municipalities are subsidizing the budgets and tax rates of the three owner cities.
The water rates established by the Commission are not submitted to the Board of Public Utilities or anyone else for approval. The Commission is independent and establishes its own rates. It is obvious that rates could be raised so as to generate income beyond that necessary to satisfy its obligations. Large surpluses could be created, not to benefit the consuming public, but to generate revenues for three cities. It may be argued that this is akin to taxation without representation.
Municipal officials have not been bashful in requesting this money. The mayor of Passaic wanted $6,000,000 distributed. Commissioner Karaszegi, who also serves under the mayor as business administrator for Passaic moved a resolution to distribute $2,000,000. In the past three years (1984-86), more than $1,500,000 has been distributed. As Superintendent Inhoffer testified "The distribution is helpful to the Commission because it shows the city owners that the Commission has compassion for the cities' problems."
Public entities are created for the purpose of all the people they serve and not the governmental bodies that create or own them. That section of paragraph 13 permitting distribution of funds has no basis or foundation in the enabling statute. It was beyond the power of the owner cities to provide for distribution of Commission funds and any distribution by the Commission is beyond its power and a violation of its public trust.
That sentence in paragraph 13 of the 1931 agreement reading "The Commission shall transmit all moneys in their hands acquired from such operation beyond what is necessary to meet *68 its obligations, to the TREASURER of the respective Cities in proportion to their ownership in said water works, that is to say, in the proportion that the assessed valuation for taxation of all real estate of each of said Cities for the year Nineteen Hundred and Twenty-Nine, bears to the total assessed valuation for said year of all the real estate in all said Cities" is declared void. It is contrary to the statute, beyond the powers of the Commission and in violation of the public policy of this State.

B.

Surplus Funds.
Although this court has determined that the Commission has no power to distribute money to its owners, it is compelled to comment on plaintiffs' position that the resolution to permit the distribution was arbitrary, capricious and unreasonable.
The fact is that the Commission operated at a loss of more than $200,000 in 1985 and over $1,300,000 in 1986. Although there were retained earnings in excess of $6,500,000 at the end of 1985, Comptroller Egan's memo of March 7, 1986 projected 1986 budget losses of over $4,000,000 and other liability of almost $4,000,000 resulting in a negative total of retained earnings or loss of $1,250,000. The report also reflected a projected 1987 budget loss of $2,500,000.
The comptroller did not endorse the $500,000 distribution, nor was he asked his opinion. At trial, Egan testified that the distribution was contrary to his understanding of paragraph 13 and was certainly premature since the Commission was in the first year of a five-year plan that contemplated surplus in the first two years would be retained to offset projected losses in the last two years.
Bowman & Co., the independent auditors hired by the Commission to review the question of "surplus" concluded that, because of projected deficits, all "consumable" surplus and *69 "available" cash will be absorbed and this "draining" of Commission funds could create a financial hardship. Comptroller Egan agreed with the conclusions in this report.
The resolution adopted April 9, 1986 recited that "Passaic Valley Water commission reasonably anticipates that there shall be a surplus in 1985 as a result of its operations of the water works which it operates." The fact is that there was no surplus in 1985 as a result of its operations and the distribution was made from retained earnings.
I find that the adoption of the aforesaid Resolution was arbitrary, capricious and unreasonable for the following reasons:
1. No surplus existed.
2. Comptroller Egan's March 1986 memo showed a negative total of $1,250,000 projected for 1986 with a further projected loss of $2,500,000 in 1987.
3. Comptroller Egan's interoffice memo to the Commission dated January 15, 1986 projected that 1985 will generate a loss figure between $600,000 and $750,000 and 1986 will be in excess of $1,000,000.
4. The report of the Commission's accountants dated February 28, 1986 (Thieberg report) shows a 1985 loss of almost $200,000.
5. The independent auditor's report (Bowman & Co.) concluded that projected deficits will use all consumable surplus and available cash.
6. The distribution violated the intent and purpose of the Commission's own five-year plan then in effect.
7. The Commission failed to request the advice or recommendation of its comptroller and chief financial officer.

IV.

Ownership of Passaic Valley Water Commission.
The City of Clifton urges the court to reform the 1931 agreement so as to establish a more equitable ownership percentage for Clifton. Clifton urges that basing the relative positions of the owner cities today on the ratio of assessed valuation for taxation as it was in 1929 is inherently unfair. The ownership percentages were established by agreement of the cities, with respect to distribution of surplus only as set forth in paragraph 13 of the 1931 agreement.
*70 The court finds nothing in the statutes establishing the Commission specifically providing for a formula of ownership among the owners. Two provisions appear to touch on the question. N.J.S.A. 40:62-116 entitled "Joint ownership" provides: "[t]hat the water works acquired by the Commission ... shall be the property of the municipalities making the application ... for the appointment of such Commission ... as if they constituted a single municipality." That language would seem to imply an "undivided" or "united" interest involving "unity of interest" and "unity of title"; i.e., equal ownership. N.J.S.A. 40:62-12 relates to the issuance of bonds to pay for the cost of acquiring the water works or subsequent improvements. It provides that "the municipalities shall be liable as among themselves for the payment of the principal and interest thereon in the proportion that the assessed value for taxation of all the real estate in each of the municipalities for the year preceding the time when such water works shall be acquired bears to the total assessed value for said year of all the real estate in all of the municipalities joining in the issuance of said bonds." This was obviously the formula agreed to by the cities when they adopted paragraph 13 of the 1931 agreement.
This court has just declared paragraph 13 invalid. In view of this ruling, the issue raised by Clifton becomes moot and will not be decided. This court has ruled that no distribution of moneys may be made to the cities and, therefore, it is of no consequence how those percentages were established or whether they should be revised.

V.

Water Rates.
One of the issues raised in the pretrial order concerns the claim that the water rates are excessive and subject to revision by the court. At the trial, the plaintiffs presented no evidence to suggest that the rates were excessive. On the contrary, any *71 evidence relating to rates suggests that the rates are fair and reasonable.
Although it has no issue to determine because of the lack of evidence, the court questions whether it has jurisdiction to determine issues involving water rates or whether those issues are reserved for the Board of Public Utility Commissioners (BPU). The Passaic Valley Water Commission has taken the position that as a municipality owned utility it is not subject to the authority of the BPU. In fact, its rate structure has never been submitted to the BPU for consideration, nor has the BPU attempted to exercise jurisdiction.
In a case dealing with a municipal utility (supplying water) owned solely by a single municipality, the Supreme Court said:
In our judgment a strong case exists for broad control over the rates of a municipal utility where service is furnished beyond the corporate limits. A municipality which sells water outside its own boundaries engages in a private or proprietary enterprise. If the users in the adjoining municipality were being served by a privately owned utility, obviously the rates would be subject to regulation by the Board of Public Utility Commissioners. Logic compels the conclusion that the Legislature would not intentionally protect such consumers against arbitrary or unreasonable charges of a private utility and leave them without equal protection against discriminatory rates of a municipal utility. [In re Complaint by Morris Twp. 49 N.J. 194, 205 (1967)].
The court held that the BPU had jurisdiction over the rates charged to nonresidents. Justice Francis, in writing for the court, however, specifically limited the decision in that opinion to cases within N.J.S.A. 40:62-49(f). That statute deals solely with water supplies owned by a single municipality. See N.J.S.A. 40:62-47 et seq. See also In re Petition of So. Lakewood Water Co. 61 N.J. 230 (1972). Query: Does the BPU have jurisdiction over rates charged to nonresidents where the water supplier is owned by more than one municipality?
This issue can only be determined by the Board of Public Utility Commissioners upon proper application. Its determination would be subject to review directly by the Appellate Division.

*72 VI.

Conclusion.
In view of the factual findings and determinations of law as set forth in this opinion, the three owner cities shall return to the Commission those moneys previously distributed to them.
Paterson shall return the sum of $296,050.
Passaic shall return the sum of $136,250.
Clifton shall return the sum of $67,700.
These moneys shall be returned to the Commission within 60 days of this date. Plaintiffs shall submit an order to the court encompassing this opinion.
NOTES
[1] Commissioner Imre Karaszegi, Jr. representing Passaic was originally named as a defendant. The New Jersey Division of Water Resources was later added as defendant. These defendants were subsequently dismissed from the suit by consent of all counsel.
[2] The Commission also owns 37 3/4% of the North Jersey Water District.
[3] Statistical abstract of the United States 81st Edition, U.S. Dept. of Commerce; 1980 Census of Population, U.S. Dept. of Commerce.
[4] Abstract of ratables and exemptions in the County of Passaic 1929, 1940; Abstract of ratables, 1986.
[5] The actual distribution of funds was permitted by court order in December 1986. It was subject to being returned to the Commission at the conclusion of the litigation and on condition that no water rate increase be made until completion of the trial.
[6] Commissioner Karaszegi was appointed Business Administrator of Passaic by Mayor Lipari and subsequently appointed by him to the Commission commencing January 1986.
[7] Commissioner Raymond Luchko of Clifton voted against the resolution. It passed 3-1 with Commissioners Pasquariello and Ferrigno of Paterson and Karaszegi of Passaic voting for it.