ROBERT H. McCARTER, attorney-general,

*v.*

THE HUDSON COUNTY WATER COMPANY.

[Decided August 22d, 1905.]

1. The court will take judicial notice that the Passaic river is a tidal stream, the bed of which, so far as the tide ebbs and flows, is the property of the state.

2. The state, as the lowest riparian owner on tidal streams by virtue of its ownership of the bed thereof, so far as the tide ebbs and flows, has the right to have the water of such streams reach its property undiminished in quantity subject to the use of the passing water by upper riparian owners in a reasonable manner for domestic and irrigation purposes, and holds the same in trust for the public, and may grant or restrict the appropriation thereof, so long as it regards the reasonable rights of others over whose lands it flows before reaching the lands of the state.

3. As the lower riparian owner, the state holds the surplus of such flowing water as the common property of its citizens, and has the power to prevent the assumption by others of its sovereign rights, or the conversion of such common property which it holds in trust for the public, the loss of which may destroy the health and comfort of its people.

4. The act of 1905 making it unlawful to transport, through pipes, the water of any fresh-water river of the state into another state for use therein, is not void as a violation of the interstate commerce clause of the federal constitution, for the right of the state to preserve the common property of its citizens cannot be destroyed merely because it is intended to transport the water into another state for use therein.

---

On information, &c.

*Mr. Robert H. McCarter,* attorney-general, for the informant.

*Mr. Gilbert Collins,* for the defendant.

BERGEN, V. C.

The East Jersey Water Company is diverting water from the Passaic river, at Little Falls, in this state, for commercial purposes, and has agreed with the New York and New Jersey Water Company to sell and deliver to it so much thereof as it may require to supply consumers, not alone in this state, but in the State of New York, without limitation as to quantity, the only consumer in this state being the city of Bayonne and its inhabitants. It is admitted that after the making of the contract the New York and New Jersey company constructed its plant, and that its main pipes to and through Bayonne were of a capacity greater than the needs of that city demanded, and designedly so, in order that through them a sufficient quantity of water might be transported into New York State for the purpose of sale and delivery to such consumers as it might there secure; that in 1904 a contract was made with the city of Bayonne, under which additional mains were allowed to be laid in the streets of that city for the purpose, among others, of carrying water to purchasers beyond its territory, the object being to transport water beyond the State of New Jersey, which contract was, shortly after its execution, duly assigned to the defendant; that the defendant has laid the mains and intends to supply water drawn from the Passaic river for the use of purchasers in the State of New York, which water the defendant intends to transport to that state through pipes and conduits laid, and to be laid, for such purpose; that the defendant confesses such to be its purpose, and has already entered into contracts with persons and corporations, private and municipal, to convey water, to be taken from the Passaic river, obtained through the East Jersey Water Company, into the State of New York for use therein; that some of these contracts were prior and others subsequent to the approval of the legislative act, which the informant insists makes unlawful the threatened acts of the defendant, and justifies this court in interfering.

It is further admitted that the Passaic river is the most important of the available sources of water-supply for the people of New Jersey, a necessity for the use of which is constantly increasing; that the present available supply of water in the Passaic river is largely in excess of the present consumption by New Jersey inhabitants, as now supplied, and that the defendant had incurred large expense in laying mains and doing other necessary work to enable it to take the water to New York State previous to the adoption of the statute now under consideration.

On May 11th, 1905, an act of the legislature of this state was approved, and became immediately effective, which, after declaring that the fresh-water streams of the state do not increase with the growth of its population, and unless carefully preserved a condition will exist detrimental to the health and prosperity of the citizens of this state, enacted as follows:

"It shall be unlawful for any person or corporation to transport, or carry through pipes, conduits, ditches or canals the waters of any fresh-water lake, pond, brook, creek, river or stream of this state into any other state for use therein,"

and empowered this court to aid in its enforcement. *P. L. 1905 p. 461.*

The information is filed by the attorney-general, and seeks to restrain the defendant from taking water diverted from the Passaic river into the State of New York for use therein. This the defendant admits it intends to do, in violation of the terms of the act, alleging that the act is void because (*a*) it impairs the obligation of contracts in force when the act was passed; (*b*) it takes property without compensation; (*c*) it provides for an interference with commerce between the states; (*d*) it denies to citizens of other states the privileges of citizens of this state, and denies them the equal protection of the laws of New Jersey; (*e*) it is in violation of the constitutions of the United States and of this state.

The question is thus presented, Can the defendant, through the East Jersey Water Company, or by other means, divert from the Passaic river, free from any control or regulation by the

state, whatever quantity it may desire of the fresh water running therein and carry it to another state, the consent of parties in interest other than the state being assumed?

As absolution from control or regulation means the right to withdraw, against the protest of the state, every drop of water from the river, a right which can only be sustained upon the ground of ownership, the fact that the defendant is a purchaser from another corporation does not alter the proposition, for its property rights, if any, are no greater than those of the original abstracter from whom it purchases.

The statement of the proposition indicates the serious import of the matters involved, for if the contention of the defendant expresses the law, persons and corporations may, by acquiring the private rights in any running stream, obtain such an ownership in the water passing down the stream as to permit its total withdrawal and transportation to a foreign jurisdiction, leaving the citizens of this state entirely destitute of a natural and necessary element of life, so far as the same may be derived from streams supplied from the running surplus or overflow of water from lakes, ponds, springs and other natural sources of potable water.

If the public have any common rights in or to the running waters of our rivers and streams at any point during its flow to the sea, such a right is manifestly held by the state in trust for the public, and it, by virtue of its sovereign power, may grant or restrict the appropriation thereof, so long as it does not interfere with the reasonable rights of other owners of land over which it flows, and any unauthorized diversion of such water above the point where the public rights appear is a wrong of which the state may justly complain and seek to restrain, and the fact that it has not heretofore objected is no reason why it may not now protest against a further spoliation of public property. It may lawfully permit its own citizens the benefit of property held in trust for them, and at the same time limit such permission to those who have a common right therein.

That the Passaic river is a tidal stream, the bed of which, so far as the tide ebbs and flows, is the property of the state, is a

fact the court will judicially notice, and the state, if a riparian owner along such stream, is entitled to have the ordinary flow of water remain in the channel, and to have it come to its lands "undiminished in quantity and unimpaired in quality by the act of any other of the owners thereof, subject to the use of the passing water, in a reasonable manner, for domestic and irrigation purposes." *Doremus* v. *Paterson, 65 N. J. Eq. (20 Dick.)* 711. And the state, upon whose lands it is finally cast before it mingles with the ocean and becomes the property of the world, is endowed with all the rights thereto which are accorded by law to the preceding owners of land through which it flows, and any diversion of what, undiverted, would flow to and over the lands of the state, and thus become public property, is the subject of legislative action, the method employed by the public to express its wishes. In my opinion, running water, having served its transient uses as it passes by, comes to the lands of the state freed from any charge on behalf of the upper landowner, except such as he may have as one of the public, and that it is the duty of the state to guard its riparian rights as zealously as does the individual. Being convinced that the state, as the lower riparian owner, has the right to have the water of streams flowing into tidal rivers reach its property undiminished in quantity, within the rule above expressed, I can see no reason why it may not regulate and control the manner of the disposition of its property rights, for acquiescence in the diversion of water which of right ought to flow to its lands is a surrender of property interests, the extent of which it may limit.

The objection that the questioned law is void as a violation of the federal constitution regarding interstate commerce does not appeal to me, for we could not consistently say that an effort on the part of the state to preserve the common property, whether in the interest of navigation or for the domestic uses of the public, after it had satisfied the proper private charges against it, could be frustrated simply because the unlawful abstracter of its property intends to transport it into another state. The defendant and those under whom it claims are corporations organized under the General Corporation act of this state, which

I cannot discover confers any right to carry on this business, other than that it is a "lawful business." Certainly there is no grant of any power or right under which it can be said the state has abrogated any of its rights in the running waters of the state, or authorized these corporations to divert from its proper channel and water course the common property of the public, and my conclusion is that the law assailed does not violate constitutional requirements, either federal or state, and being a mere regulation of the extent to which a diversion of public property permitted, but not given, may go, is valid legislation.

Whether this act be valid or not, under the view I take of this question the state may rest its case upon general principles, and does not need the support of the statute under review. The state has a duty to perform in that it must protect its citizens against the assumption by individuals or corporations of any of its sovereign rights, or the conversion to private use of such common property and rights as the state is said to hold in trust for the public use, the loss of which may destroy the health and comfort of its subjects. "The policy of the common law is to assign to everything capable of ownership a determinate owner. If capable of occupancy, and susceptible of private ownership and enjoyment, the common law makes it exclusively the subject of private ownership; but if such private ownership and enjoyment are inconsistent with the nature of the property, the title is in the sovereign, as trustee of the public, holding it for the common use and benefit." *Cobb* v. *Davenport, 32 N. J. Law (3 Vr.) 369, 378.* The question considered in the case last cited turned upon a right of fishery in non-tidal waters, and the learned jurist who read the opinion of the court was not called upon to, and did not, define the quality of ownership to be gained in running water, and while he defined public waters as tidal and waters non-tidal as private, he cannot be taken to have meant that, beyond the right of fishing, there is any exclusive ownership in running water vested in one landowner along such a stream against another, and while one may have such an ownership in the land over which the water passes as to control an interference with the water and the taking of fish therein while

the water and fish are over his land, it was not decided that a permanent continuous property in running water attached to any riparian owner. On the contrary, he declared the law to be that if such private ownership is inconsistent with the nature of the property, *i. e.,* if not capable of occupancy or susceptible of private ownership and enjoyment, the title rests in the sovereign, and certainly a vested continued ownership by a private landowner of running water would be inconsistent with the nature of the property. "Water is a movable, wandering thing, and must of necessity continue common by the law of nature, so that I can only have a temporary, transient, usufructuary property therein." *2 Bl. Com. 18.* In *Ang. Waterc.* § *95,* the writer well expressed the law in these words:

"but strictly speaking he [the riparian owner] has no property in the water itself, but a simple use of it while it passes along. The consequence of this principle is that no proprietor has a right to use the water to the prejudice of another."

The Roman law considered running water as public or common in the sense that all might drink it or apply it to the necessary purposes of supporting life, and that no one had any property in the water itself, except in that particular portion which he might have abstracted from the stream, and of which he had the possession, and during the time of such possession only, and by the law of England, water flowing in a stream is *publicis juris,* subject to the rights of adjacent landowners, as defined by law. *Mason* v. *Hill, 5 Barn. & Ad.* *123; 25 Eng. Rul. Cas. 382.* There are some things, says Blackstone, which, notwithstanding the general introduction and countenance of property, must still unavoidably remain in common, being such wherein nothing but an usufructuary property is capable of being had, and therefore they still belong to the first occupant during the time he holds possession, and no longer. Such, among others, are the elements of light, air and water. *2 Bl. Com. 14.*

Thus it appears from immemorial times running water, as one of the elements of life, health and comfort, has been esteemed common property, subject to usufructuary use by the

owners of land over which it passed, a use which, by legal construction based upon public needs, has been from time to time enlarged to meet the demands of civilization and preserve the peace of society, but it has never been extended to the point of absolute ownership, to the detriment of a lower landowner. If diverted, it must be returned undiminished, except as to the incidental waste made necessary by the personal private use, for domestic and other recognized lawful purposes appertaining to the land and its occupant.

The ownership of the bed of tidal rivers is vested in the state, so far as the tide ebbs and flows, an ownership which carries with it property rights in the water covering it, whether fresh or salt, for while the line of demarcation between public and private waters has been settled in this state to be the point where the tide ebbs and flows, this is not limited to a point where the salt and fresh water meet, nor to water impregnated with salt, as that would open the question to the very uncertainty which Justice Depue so strongly deprecated in *Cobb* v. *Davenport, supra.* In *Rex* v. *Smith, 2 Doug. 441,* it was argued that the river Thames, above London bridge, was not "navigable," although it was flowing and reflowing, inasmuch as the tide beyond that limit was occasioned by the pressure and accumulation backward of fresh water. But this distinction met with little favor, and was pronounced by Lord Mansfield as novel and inadmissible. In *Horne* v. *Mackenzie, 6 Cl. & F. 628, 643,* a ruling that the limit of an estuary was fixed by ascertaining "whether there was a predominance of salt or fresh water at the place" was overruled, and in *Peyroux* v. *Howard, 7 Pet. (U. S.) 324, 343,* it was held that although the current in the Mississippi at New Orleans may be so strong as not to be turned backwards by the tide, if the effect of the tide upon the current is so great as to occasion a regular rise and fall of the water, it may properly be said to be within the flow of the tide.

It is common knowledge that in all of our fresh-water rivers, and especially so as to the Passaic, there are long reaches or basins, where the water remains fresh, although subject to ordinary tidal influences, and as the bed of such portions of tidal

streams is the absolute property of the state, it acquires, by virtue of such ownership, riparian rights in the flow of the water.

The position of the state is different from that of other riparian owners. Large bodies of fresh water which have already served the proper purposes of private riparian owners above the lands of the state are received upon common property, forming great reservoirs of a valuable natural element necessary for the health and comfort of all the people, and in which every vestige of private right, subject to which the common right is held, has been extinguished, for the state, being the last riparian owner, has no other to account to, the owners of the upland along tidal waters having no rights therein, and the state should be considered as the ultimate owner of such unused common property, to be held in trust for the use of all its subjects.

The constant increase in our population, considered in connection with the unchanging extent of our water-shed, and the consequent limit of the natural supply of water necessary for domestic and healthful purposes, may justly alarm the state with regard to the future, and a neglect to insist upon its rights in the past, when conditions did not require a strict enforcement of its privileges, works no estoppel, and justifies the restriction of the appropriation of its property.

It is admitted that the Passaic river is the most important of the available sources of water-supply for the people of New Jersey, and that their necessity therefor is constantly increasing. This river in its natural condition carries from its source to the ebb and flow of the tide a necessary element of life, the common property of the public, subject to usufructuary use; and finally delivers it, when not diverted, upon the public lands, as free from private claim as the land upon which it rests, and when thus delivered it becomes the property of the sovereign, who may divert or permit its diversion, and any obstruction or diversion, subject to the exceptions stated, which tends to diminish the quantity that should flow upon its lands is an invasion of its rights. It has a right, unless it grants it to another, to the ultimate disposition of what remains of all waters which naturally empty into a tidal stream after the transient rights of

riparian owners have been exhausted, and no one has a right to divert the water for commercial purposes without the grant of the state, in the absence of which such abstraction is the conversion of public property without legislative authority. The state may grant this right, but until it does it should be held beyond the reach of private appropriation. That the permission of the state to divert from the Passaic river water for private consumption has been recognized is manifested by the act authorizing the construction of water works for Jersey City. *P. L. 1852 p. 419,* the first section of which expressly authorizes the taking of

"such portion of the water of Passaic river flowing between the villages of Acquackanonck and Belleville as may be required to furnish the inhabitants of said city, and others residing adjacent thereto, with a sufficient quantity of pure and wholesome water for domestic and other uses,"

a grant of a right, limited to certain uses, then thought to be necessary before the property interests of the state could be taken.

The defendant insists that as the threatened action will not now actually absorb the river, because there is yet a surplus of water not drawn and taken for New Jersey consumers, the state must wait until the diminution is appreciably affecting its citizens, but that argument does not meet the principle involved, which is, Can the state regulate the diversion and application of running water which naturally empties into tidal streams, having due regard to the rights of riparian owners? The answer must be that it has, thereby conserving the common interests of its people, otherwise private enterprise may remove all potable water and sell it in another state, disregarding the riparian rights of the state and divesting it of its proper ownership in all surplus waters which, undisturbed, would come to its possession.

My opinion is that, subject to the lawful transient rights of riparian owners along the banks of running streams the waters of which finally empty into a tidal stream, there is vested in the sovereign power the right to insist upon the proper riparian user of the waters therein, in order that the common right to the use of the residue, which is not private property, may be preserved for the benefit of those to whom all common property

belongs; nor would the grant of every owner of land along the stream, from its source to tidewater, affect the right of the public (for which the state is but another name), for that only can be granted which the grantor hath, which is the transitory usufructuary use, subject to which running water is *publicis juris.* As the threatened act is an invasion of a common right, in that it will result in the removal from the state of the common property, it has a right to protest against the proposed increased diversion, and should seek to protect the public estate.

Other questions were discussed on the argument, but I prefer to rest my conclusion on the reasons I have given, for I am satisfied that the state, in its sovereign right as owner of the bed of all tidal streams, becomes the owner of all fresh water flowing upon its land, and that any interference with the proper flow of such water, resulting in a diminishment of the natural quantity, is the subject of equitable interference, and also that the Corporation act, under which the defendant and its agents exist, grants no right in derogation of public ownership of such water, and that, without such grant, the taking of water from running streams for commercial purposes is, as against the state, a wrong to be restrained, and that the restraint may be limited to such takers as the state may elect. It is perhaps pursuing a just policy when it permits, without objection, the taking of its property to be served to its people, but it cannot be compelled to the unauthorized extension of its gift to citizens of another jurisdiction.

On the hearing the defendant insisted that the relief sought by the information was confined to the question of the constitutionality of the act. If the pleadings should be so narrow as to present only this one question, they may be amended to meet the real question presented and argued, and which I have considered and determined.

This conclusion does not impair the obligation of contracts within the legal acceptation of the term. No vested right is affected, for the defendant has none in the subject-matter, and all of its contracts were made with regard to existing conditions, of which it is presumed to have had knowledge.

The informant is entitled to a decree, and I will so advise.