984 A.2d 895 (2009)
411 N.J. Super. 135
In re Petition for Referendum on CITY OF TRENTON ORDINANCE 09-02.
No. A-5864-08T3.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 2009.
Decided December 17, 2009.
*898 George T. Dougherty argued the cause for appellant Committee of Petitioners Against Ordinance 09-02 (Katz & Dougherty, attorneys; Mr. Dougherty, on the brief).
William W. Northgrave argued the cause for respondent City of Trenton (McManimon & Scotland, attorneys; Edward J. McManimon, III and Mr. Northgrave, Newark, on the brief).
Ira G. Megdal, Cherry Hill, argued the cause for respondent/intervenor New Jersey American Water Company, Inc. (Cozen O'Connor, attorneys; Mr. Megdal and Douglas W. Frankenthaler, on the brief).
Joseph L. Mooney, III, Trenton, and Zachary B. Corrigan, of the Washington bar, admitted pro hac vice, attorney for amicus curiae Food & Water Watch, Inc. (Mr. Corrigan, on the brief).
Before Judges CARCHMAN, LIHOTZ and ASHRAFi.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
This appeal requires us to consider: 1) whether the Optional Municipal Charter Law (the Faulkner Act), N.J.S.A. 40:69A-1 to -210, mandates a referendum when a portion of a city's water system is sold; and 2) whether N.J.S.A. 40:62-3 to -4 excepts this sale from the assertedly mandated referendum. Here, respondent City of Trenton (the City) proposed to sell a portion of its water system to intervenor New Jersey American Water Company, Inc. (NJAWC).[1] Petitioner, the Committee of Petitioners, a group of citizens in Trenton, opposes the sale and asserts that the ordinance enabling the sale must be placed on the ballot consistent with the public referendum provisions of N.J.S.A. 40:69A-185 (Section 185).
In response to petitioner's challenge, the City sought a declaratory judgment that the ordinance was not subject to a public referendum. Following a plenary hearing, Assignment Judge Feinberg, in the Law Division, granted the relief. Petitioner appealed.
We agree with the judge's finding that the sale was subject to the exception provisions of N.J.S.A. 40:62-3.1 (Section 3.1), involving a sale "serving less than 5% of the population of the municipality" and was not subject to a referendum under the Faulkner Act. We affirm.

*899 I.

A.
Our consideration of the relevant statutes requires a brief review of the factual underpinnings of this dispute. The City, a Faulkner Act municipality, operates a water utility system, the Trenton Water Works (TWW). The City has identified two components of TWW: the Inside Water Utility System (IWUS), which serves the City, its residents and businesses; and the Outside Water Utility System (OWUS), which serves and delivers potable water exclusively to residents and businesses within the Townships of Ewing, Hamilton, Hopewell and Lawrence (the Townships). The water facilities located in IWUS are physically and hydraulically interconnected to the water facilities in OWUS. Physically, OWUS is located in the Townships, outside the City.
In 2000, the City retained Killam Associates to prepare a study (the Killam Report) to determine whether OWUS and IWUS could operate as separate entities. The City took no action following the completion of the report. In 2005, however, the City commissioned MWH, an engineering consulting firm, to prepare a comprehensive report (the MWH report) to update and supplement the Killam report. The MWH report provided the City with an assessment of the feasibility of dividing the Trenton water distribution system into two separate systems, proposed a plan to separate the systems and submitted an estimate of probable construction costs for separation.
Based on these findings, the City determined that separating OWUS and IWUS would promote public health and safety and would benefit both the City and the Townships. The City also determined that subject to the supervision and regulation of the New Jersey Board of Public Utilities (BPU), as required by Section 3.1, the best interests of the public would be served by selling OWUS to a private water utility.
On February 27, 2007, the City prepared and distributed a Request for Proposals (RFP) for the sale of the OWUS. After receiving responses to the RFP, the City determined that NJAWC submitted the most advantageous proposal. The offered purchase price was $100 million. The City negotiated a contract (the agreement) with NJAWC for the sale of OWUS, conditioned upon NJAWC purchasing water from the City on a long-term basis. The City Council, by ordinance adopted in December 2007, authorized the implementation of the transaction.
The City submitted the agreement to the BPU for review and approval. Since several parties affected by the terms of the agreement submitted petitions to intervene in the BPU proceedings, the BPU sent this matter to the Office of Administrative Law as a contested matter. Several meetings were held with regard to BPU's approval of the Agreement, including a July 23, 2008 public hearing, at which members of the public voiced their concerns. As a result, the City and NJAWC accepted some changes to the Agreement. The Administrative Law Judge reviewed the stipulation and Agreement, issued an initial decision accepting the settlement and referred the case back to the BPU for approval. On February 3, 2009, the City Council adopted Ordinance 09-02, which approved the final terms of the sale of OWUS to NJAWC with amendments made to the original agreement. Mayor Douglas Palmer approved the agreement on February 5, 2009.

B.
Not all parties viewed the sale positively. On February 25, 2009, petitioner filed *900 a petition demanding that Ordinance 09-02 be placed on a ballot for approval by voters pursuant to the Faulkner Act public referendum provisions, Section 185. The City responded by seeking a declaratory judgment that the Petition was null and void. NJAWC sought and was granted intervention.
The inquiry in the Law Division focused on whether Section 3.1 supersedes Section 185; whether OWUS served more than five percent of the City's population; and whether OWUS and IWUS constitute a single system or two separate systems.
After the initial filings, without taking testimony,[2] the judge concluded:
In this particular case, the petitioner[] challenge[s][] the sale to the New Jersey Water Company, they allege that the system is one and they allege that a sale requires that it go before the voters. Now when you look at 40:62-3.1, it's really quite clear and is really not subject to more than one interpretation. It permits a municipality to sell its water and to do that without submitting it to the voters, if the sale involves services or water that does not serve  that serves less than 5 percent of the population in the City of Trenton. So, the issue is will the City of Trenton be impacted by the sale.
What I have before me from the Board of Public Utilities and prior cases, representations from the New Jersey Water Company, the City of Trenton, review of the public hearings is that sale of the water company only impacts residents from outlying municipalities. It will not affect people in the City of Trenton. It will affect Ewing, Hamilton, Lawrence and Hopewell. The fact that they share [pipes] is not dispositive as indicated by counsel. That is not unusual. The water comes in and ultimately the water is distributed.
The certification of Mr. Guhl who used to be the municipal manager in the 90s, is not an engineer and was obviously involved in the budget process and has provided information about the impact of one system on the other, but it doesn't change the fact that the sale of OWUS will not affect the residents in the City of Trenton, they're just not serviced by that water company.
....
And so it's the Court's conclusion that this sale, although clearly under the Faulkner Act, an ordinance is subject to referendum, and we give voters the opportunity to voice their position at the polls, but when you have a specific statute and this is about as clear as you can get, that stands for the proposition that if you meet the requirements in 40:62-3.1, and 40:62-4 and 40:62-5, just does not apply and that's not incompatible with 40:69(a)-184, 85, or 86.
And so, it's the Court's conclusion that the petition should be declared void and that this matter may proceed whenever the BPU hearing is scheduled and that the sale assuming it is approved, would go through.
On April 3, 2009, during the pendency of the hearing in the Law Division, the BPU issued an order adopting the City's and NJAWC's stipulations. The BPU determined that N.J.S.A. 40:62-3.1 guided the Board "in reviewing the proposed transaction from the perspective of the seller." *901 The BPU further determined, among other things, that the proposed sale was unlikely to have any negative impact on the provision of safe and proper service, the sale would not adversely affect competition and customers in OWUS would receive a rate reduction.
Petitioner moved for reconsideration. Both petitioner and respondents served expert reports. Petitioner's expert, Frederick Yoerg, P.E., filed a certification opining that IWUS and OWUS were part of a "single, integrated water system" and that fifty-eight percent of the population would be affected by this sale.[3]
NJAWC served its expert report (the Tambini Report). The Tambini Report concluded:
a) The TWW is currently comprised of IWUS and OWUS;
b) OWUS serves less than 5% of the population of the City;
c) The assets and facilities in IWUS provide water utility service for the customers in IWUS and to customers in OWUS;
d) The assets and facilities in OWUS do not provide water utility services for customers in IWUS. The assets and facilities in OWUS only provide water utility service to customers in OWUS;
e) Water stored in storage tanks in OWUS does not flow "back" to serve IWUS customers, including during periods of seasonal and daily peak demands and during fire flow demand conditions. IWUS system does not "float" off of OWUS tanks. OWUS tank water levels fluctuate and OWUS tanks flow to meet demands within OWUS and they do not "float" and flow to meet demands in IWUS;
f) Water utility service water demands, including fire flow and storage needs within IWUS are met only from the City's water treatment plant, the Pennington Reservoir and the Central Pump station. These assets are located in IWUS;
g) The City does not need to currently construct additional storage for IWUS nor does it need to construct additional storage for IWUS post-separation, that is after the sale of OWUS.
Following the hearing, the judge concluded that the Tambini report was "reliable [and] persuasive." She adopted the findings and concluded:
Number one, in the Tambini report, which I was very impressed with, the Trenton Water Works is currently comprised, as we know, of IWUS and OWUS. I am convinced, based upon the hydraulic analysis, the computerized models, and the conclusions drawn by Tambini  he's a professional engineer  that OWUS serves less than 5 percent of the Trenton population.
The diagrams in his report, which were referred to here today, show that the central pumping units serve IWUS and OWUS. There is no water flowing from OWUS to IWUS. There's no question that this transfer, this sale, is not going to influence the amount of water in IWUS. It's just clear. When I say it serves less than 5 percent, I don't think it serves Trenton at all.
Three. The assets and facilities and IWUS provide water utility services for the customers in IWUS and OWUS, *902 however, O-W-U-S does not provide water utility services for customers in I-W-U-S. The assets and facilities in OWUS only provide water utility service to customers in OWUS. And the water that is stored in OWUS storage tanks do not flow back to serve IWUS customers, including during periods of seasonal and daily peak demands and during fire flow demand conditions.
[I am a]lso satisfied, based on the conclusions of Tambini, that when IWUS pumping and/or supply is temporarily turned off, its hydraulic grade line service pressures are not maintained by water stored in OWUS elevated storage facilities. And when the OWUS water tank levels fluctuate and OWUS tanks flow to meet demands, it's only within OWUS. OWUS tanks do not flow to meet demands I-W-U-S.
After reviewing the methodology utilized by the expert in conjunction with NJAWC, the judge expanded and analyzed water flow, daily demand, fire flow, power failures and catastrophic failure of facilities and storage, all supporting her conclusion that the systems are independent.
Discussing the opinions rendered by Yoerg, petitioner's expert, the judge stated:
Interestingly enough, [Mr. Yoerg] conducted no factual investigation in support of his claim that the O[WUS] tanks supply water to Trenton residents. He admits that he conducted no independent factual investigation in preparing his report.
. . . .
[Mr. Yoerg] engaged in extensive calculations, at least in his original report. Using that data, he concludes that in all scenarios present by the report, O storage will not flow back into I. So he finally acknowledges that. He also . . . withdrew his conclusion that additional storage would be required if the systems are separated.
It's interesting, because he withdrew many of the representations in his April 9th, 2009 certification, which would lead one to believe he's in line with the recommendation or the conclusion by Tambini, but then at the end he commits to that 58 percent, which, quite frankly, is totally inconsistent with other parts of his deposition.
There's no  and just with regard to the conclusions of Mr. Yoerg, from the exhibit that was presented by counsel, I think I've already mentioned that the Trenton Water Works is currently comprised of the IWUS and OWUS, and he agreed with that in the deposition. The OWUS served less than 5 percent of the population. He agree [sic] with the assets and facilities in the I provided water utility service for customers in I and to customers in the O, agreed with by Yoerg.
The judge confirmed her earlier conclusions that less than five percent of the population was served by OWUS. She denied the motion for reconsideration and dismissed the petition. This appeal followed.

II.
While petitioner raises a number of points in its brief, the essence of its argument is that Section 185 mandates a referendum on the Ordinance and nothing in Section 3.1 abrogates that requirement.
We first address our standard of review, a point of contention between the parties. At its core, this appeal presents an issue of statutory interpretation, and in addressing such issues, we review the trial court's interpretation de novo. In re Liquidation of Integrity Ins. Co., 193 N.J. 86, 94, 935 A.2d 1184 (2007) (citing Toll Bros., *903 Inc. v. Twp. of W. Windsor, 173 N.J. 502, 549, 803 A.2d 53 (2002)). This appeal, however, addresses factual determinations made by the judge in determining whether Section 3.1 exempts the sale from Section 185's provisions. Our review of these findings mandates a different, limited standard of review. We will defer to the trial judge and not disturb her factual findings so long as "there is sufficient credible evidence in the record to support the findings." Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 397, 972 A.2d 1112 (2009) (quoting State v. Adams, 194 N.J. 186, 203, 943 A.2d 851 (2008)). We "may not `engage in an independent assessment of the evidence as if [we] were the court of first instance.'" In re Taylor, 158 N.J. 644, 656, 731 A.2d 35 (1999) (quoting State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999)). We will "limit our review of those findings and recommendations to a consideration of whether they are supported by sufficient credible evidence in the record[.]" State v. Chun, 194 N.J. 54, 88-89, 943 A.2d 114, cert. denied, ___ U.S. ___, 129 S.Ct. 158, 172 L.Ed.2d 41 (2008). If the trial judge's findings are supported by sufficient credible evidence, we "must accept" those findings. State v. Arthur, 184 N.J. 307, 320, 877 A.2d 1183 (2005).
We briefly address the role of the BPU on this appeal and a suggestion that it interpreted the statutory provisions at issue. In In re Raymour and Flanigan Furniture, we noted that "[w]hen interpreting a statute or regulation that an agency is charged with enforcing, we give substantial deference to the agency's interpretation[,] which `will prevail provided it is not plainly unreasonable.'" 405 N.J.Super. 367, 376, 964 A.2d 830 (App.Div.2009) (quoting Merin v. Maglaki, 126 N.J. 430, 436-37, 599 A.2d 1256 (1992)). Here, the BPU did not render an interpretation of Section 3.1 but determined that Section 3.1 "guides the Board in reviewing the proposed transaction from the perspective of the seller." The BPU did not determine, however, whether Section 3.1 supersedes Section 185. Rather, petitioner protests Judge Feinberg's interpretation of the pertinent statutes, not the BPU's. We therefore review the trial judge's interpretation de novo, not the BPU's.
In interpreting a statute, we construe and interpret the statute as enacted.
At the outset of New Jersey's statutory code, the Legislature reminds us that a statute's "words and phrases shall be read and construed within their context" and "given their generally accepted meaning." N.J.S.A. 1:1-1. To that end, "statutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole." Bedford v. Riello, 195 N.J. 210, 224, 948 A.2d 1272 (2008) (citing In re Distribution of Liquid Assets, 168 N.J. 1, 17-18, 773 A.2d 6 (2001)); see also 2A Sutherland on Statutory Construction § 46:05 (6th ed.2002).
When the language in a statute "is clear and unambiguous, and susceptible to only one interpretation," courts should not look "to extrinsic interpretative aids." Lozano v. Frank DeLuca Constr., 178 N.J. 513, 522, 842 A.2d 156 (2004) (citation and internal quotations marks omitted). However, "if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, `including legislative history, committee reports, and contemporaneous construction.'" DiProspero [v. Penn], [] 183 N.J. [477,] [] 492-93[874 A.2d 1039] [2005] (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75, 861 A.2d 123 (2004)). Courts "may also resort *904 to extrinsic evidence if a plain reading of the statute leads to an absurd result." Id. at 493, 874 A.2d 1039.
[Burnett v. County of Bergen, 198 N.J. 408, 421, 968 A.2d 1151 (2009).]
We begin our review by analyzing the express language of the statutes, giving maximum effect to the actual language of the statutes, and we turn to extrinsic aids only if the statutes are ambiguous, susceptible to more than one interpretation or if the plain language would create absurd results.

III.

A.
We now address the specific statutes at issue.
Section 185 confers upon the voters of Faulkner Act municipalities, such as Trenton, the right to approve challenged ordinances by referendum. The statute provides:
The voters shall also have the power of referendum which is the power to approve or reject at the polls any ordinance submitted by the council to the voters or any ordinance passed by the council, against which a referendum petition has been filed as herein provided. No ordinance passed by the municipal council, except when otherwise required by general law or permitted by the provisions of section 17-32(b) of this act, shall take effect before twenty days from the time of its final passage and its approval by the mayor where such approval is required. If within twenty days after such final passage and approval of such ordinance a petition protesting against the passage of such ordinance shall be filed with the municipal clerk and if the petition shall be signed by a number of the legal voters of the municipality equal in number to at least 15% of the total votes cast in the municipality at the last election at which members of the General Assembly were elected, the ordinance shall be suspended from taking effect until proceedings are had as herein provided.
The provisions of this section shall not apply to any ordinance which by its terms or by law cannot become effective in the municipality unless submitted to the voters, or which by its terms authorizes a referendum in the municipality concerning the subject matter thereof.
[N.J.S.A. 40:69A-185.]
"When a referendum petition is properly filed, the voters have the final say in approving or rejecting an ordinance at the ballot box." In re Ordinance 04-75, 192 N.J. 446, 450, 931 A.2d 595 (2007). Section 185 promotes public notice and participation in the democratic process and may be circumvented only where the Legislature expressly articulates "exceptions to the statutory mandate that `any ordinance' is subject to referendum." Id. at 451, 931 A.2d 595 (holding that since there was no applicable statutory exception for the passage of Ordinance 04-75, it was subject to the referendum process pursuant to Section 185). Contrary to petitioner's assertions, not every ordinance passed by a municipality shall be subject to the referendum process described in Section 185, regardless of whether there are any statutory exemptions. See Ordinance 04-75, supra, 192 N.J. at 451, 931 A.2d 595. The Court recognized the limitations of its own language by observing that the Legislature exempted certain ordinances from referendum challenge, for example:
the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -129, provides that "[n]o zoning ordinance and no amendment or revision to any zoning ordinance shall be submitted to or adopted by initiative or referendum." N.J.S.A. *905 40:55D-62(b); see also Tumpson v. Farina, 240 N.J.Super. 346, 351, 573 A.2d 472 (App.Div.) (recognizing N.J.S.A. 40:55D-62 as statutory exception to referendum statute), aff'd, 120 N.J. 55, 575 A.2d 1368 (1990). The MLUL was enacted after passage of the Faulkner Act, demonstrating that the Legislature knew how to carve out exceptions to the referendum statute. Ordinances exempted from referendum are found in many other statutes. See, e.g., N.J.S.A. 27:19-26.5 (exempting from referendum municipal ordinances authorizing sale, lease, or conveyance of real or personal property to commission); N.J.S.A. 40:14B-48 (exempting from referendum municipal ordinance authorizing sale, lease, or conveyance of real or personal property to municipal authority for purpose of maintaining or operating utility system, including water distribution or sewage facilities); N.J.S.A. 40:66A-52 (exempting from referendum municipal ordinance authorizing sale, lease, or conveyance of real or personal property to solid waste management authority); N.J.S.A. 40:68A-19 (exempting from referendum municipal ordinance authorizing sale, lease, or conveyance of real or personal property to port authority); N.J.S.A. 40:68A-56 (exempting from referendum municipal ordinance authorizing sale, lease, or conveyance of real or personal property to municipal port authority); N.J.S.A. 40A:2-18 (exempting from referendum certain bond ordinances); N.J.S.A. 40A:4-3.2 (exempting from referendum municipal ordinance adopting State fiscal year).
[Ordinance 04-75, supra, 192 N.J. at 466-67, 931 A.2d 595.]
In these instances, the Legislature explicitly exempts these statutes from the general referendum provisions of Section 185. In N.J.S.A. 27:19-26.5, N.J.S.A. 40:14B-48, N.J.S.A. 40:66A-52, N.J.S.A. 40:68A-19 and N.J.S.A. 40:68A-56, the statutes provide that a municipality, county or person may act "without any referendum. . . ." Similarly, N.J.S.A. 40A:2-18 and N.J.S.A. 40A:4-3.2 provide that each respective statute "shall not be subject to referendum."
While the general provisions of the Faulkner Act provide for the referendum process, a different statutory scheme is apparent in N.J.S.A. 40:62-3 to -5, addressing the sale or lease of utilities to private interests. Generally, the operative provisions of these statutes permit a sale to private interests but only upon compliance with, among other requirements, voter approval, in the first instance. N.J.S.A. 40:62-3[4] (Section 3). The Legislature has carved out an exception; sales of water utilities serving less than five percent of *906 the population of the municipality need not comply with the voted approval provisions.
Specifically, Section 3.1 provides:
If the governing body of any municipality shall deem it advisable in the interests of public health and safety to transfer a municipal water utility system serving less than 5% of the population of that municipality, to any person or another municipality or any authority, commission or other public body, the transfer shall be authorized by ordinance and may be made upon such terms as the ordinance shall provide, and the provisions of R.S. 40:62-4 and R.S. 40:62-5 shall not apply thereto. The terms of such sale and the ordinance authorizing same shall be subject to review by the Board of Public Utilities and shall provide that the purchaser shall have the privilege to operate the system within the area of the municipality covered.
[(Emphasis added).]
To restate, if a municipality determines that it is in the interest of public health and safety to transfer a water system serving less than five percent of its population to any person, the municipality must enact an ordinance to effectuate the transfer, but the municipality does not have to follow the ballot requirements of Section 3, Section 4 and Section 5. Critically, however, the terms of the sale and ordinance shall be subject to review by the BPU and must provide that the purchaser has the privilege to operate the water system within the area of the municipality covered. Unlike Section 185, which provides that a referendum is required where an ordinance is challenged by voters, Section 3.1 outlines a separate, alternative system of review.
We considered an analogous review process in We the People Comm., Inc. v. City of Elizabeth, 325 N.J.Super. 329, 739 A.2d 430 (App.Div.1999). We held that an ordinance adopted pursuant to the New Jersey Water Supply Public-Private Contracting Act (Water Supply Act), N.J.S.A. 58:26-19 to -27, was not subject to the referendum procedure in Section 185. The Water Supply Act provided "an elaborate and detailed set of procedures a `public entity must follow' in order to privatize its water supply system." Id. at 333, 739 A.2d 430 (citing N.J.S.A. 58:26-19). We determined that this procedure was "intended to supplant the Faulkner Act's referendum provisions." Id. at 335, 739 A.2d 430.
The rationale of City of Elizabeth applies with equal force here. The Legislature has supplanted the referendum procedure where the effect of such sale on the residents has been minimized, but it has provided for a careful review by the BPU to insure that the citizenry has a voice in the process. Here, public hearings afforded the residents of Trenton, including citizen-members of petitioner, an opportunity to be heard and present their view on the impending sale.

B.
We now address, seriatim, petitioner's claims regarding Section 185 and Section 3.1. Petitioner urges that Sections 185 and 3.1 are in "virtual harmony" and nothing in Section 3.1 supersedes the right of protest petition in Section 185. It argues that the Municipal Utility Law (MUL), N.J.S.A. 40:62-1 to -151, and other statutory provisions "express an intent to mandate public participation" similar to Section 185, and the MUL does not override Section 185.
In a related argument, petitioner claims that the Legislature did not intend for Section 3.1 to override Section 185 and *907 N.J.S.A. 40:69A-181[5] (Section 181) because the Legislature did not insert "N.J.S.A. 40:69A-185 and 40:49-1"[6] into the phrase: "and the provisions of R.S. 40:2-4 and R.S. 40:62-5 shall not apply thereto" in Section 3.1. Rather, the words, "shall not" in Section 3.1 refers to the mandatory referendum procedure pursuant to Section 4 and 5, not Section 185 or Section 181(b). Relying upon Ordinance 04-75, supra, 192 N.J. 446, 931 A.2d 595, and City of Ocean City v. Somerville, 403 N.J.Super. 345, 958 A.2d 465 (App.Div. 2008), petitioner argues that Section 185's provisions may not be curtailed absent an "express mandate or a comprehensive regulation of the field," and Section 3.1 should not be interpreted as overriding Section 185. Petitioner further distinguishes City of Elizabeth, supra, 325 N.J.Super. 329, 739 A.2d 430, negating its relevance here because that case involved the Water Supply Act, not Section 185.
We reject petitioner's arguments. In Ordinance 04-75, supra, 192 N.J. at 451, 931 A.2d 595, the Court informs us of the necessity of a specific legislative mandate to supersede the principle that "`any ordinance' is subject to referendum." Likewise, in City of Ocean City, supra, 403 N.J.Super. at 360, 958 A.2d 465, we noted that "[o]ther limitations on the initiative power may be found in legislative mandates, either express or implied." As we have observed, Section 3.1 provides an alternative procedure for review by the BPU which supersedes Section 185's general provisions. See City of Elizabeth, supra, 325 N.J.Super. at 335, 739 A.2d 430. The alternative procedure for review of an ordinance need not be the same as the process outlined in City of Elizabeth. Our holding in City of Elizabeth did not mandate that a statute must track the same procedures of the Water Supply Act in order to override Section 185; instead, we noted that this alternative process demonstrates legislative intent to supersede Section 185's general provisions. We deem it unnecessary for Section 3.1 to also state that the provisions of Section 185 do not apply; providing that the BPU will review any enacted ordinance under Section 3.1 is sufficient to conclude that the Legislature intended to override Section 185.
Amicus Food & Water Watch, Inc. (FWW) focuses on the last sentence in Section 3.1  "and shall provide that the purchaser shall have the privilege to operate the system within the area of the municipality covered"  and asserts that this language implies that a municipality may only sell a water system within its own borders. FWW claims Section 3.1 "has limited applicability to those sales where the selling municipality's ordinance grants the privilege to the purchasing entity to operate within the area of the selling municipality," and the City is not permitted to sell a water system outside its own municipality, in OWUS. As this argument was raised for the first time in the amicus brief on this expedited appeal, respondents did not have an opportunity to respond.
*908 Amicus FWW's proposed interpretation is contrary to the express language of the statute, and nothing in the case law supports such a reading of the statute. Section 3.1 provides that the purchaser will have the privilege to operate the system within the area of the municipality covered. Rather than suggest that a municipality may not sell a water system outside its limits, this sentence assumes that municipalities would sell water systems outside its own boundaries. The Legislature protected purchasers so they would have the authority to control the water system "within the area of the municipality covered" by that system.
We briefly address petitioner's additional legal arguments. First, we reject petitioner's contention that Sections 185 and 3.1 were not reconciled consistent with the canons of statutory construction. Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14-15, 878 A.2d 829 (2005); Campbell v. Borough of North Plainfield, 404 N.J.Super. 337, 961 A.2d 770 (App.Div.2008).
Section 3.1 and Section 185 are not in conflict. Section 185 is a statute of general application and applies, as defined, generally. See Ordinance 04-75, supra, 192 N.J. 446, 931 A.2d 595; City of Ocean City, supra, 403 N.J.Super. at 351-52, 958 A.2d 465. Section 3.1 overrides Section 185 in narrow circumstances  where a municipality wants to transfer a water utility system serving less than five percent of the population of that municipality  and affords an alternative process of review.
We likewise reject petitioner's argument that the legislative history of Section 3.1 precludes its application here. Petitioner alludes to the 1981 application of the statute to the sale of a small water system in Woodbridge. Notwithstanding petitioner's argument, this is not special legislation, see Town of Secaucus v. Hudson County Bd. of Taxation, 133 N.J. 482, 494, 628 A.2d 288 (1993), and as a matter of historical import, Governor Byrne refused to sign the law unless the terms and conditions of the sale, which is conducted "without referendum[,]" "be subject to approval by the [BPU]. . . ." Governor's Veto Statement to S.1565 (Jan. 22, 1981).
We need not dwell on the provenance of the statute as certain principles of statutory interpretation resolve the issue. Legislative intent is most readily and accurately determined by examining the actual language of the statute. See Burnett, supra, 198 N.J. at 408, 968 A.2d 1151 (stating that "`the best indicator of [legislative] intent is the statutory language'") (quoting DiProspero, supra, 183 N.J. at 492, 874 A.2d 1039). When a statute is plain on its face, a court must not look to extrinsic aids or evidence. Ibid. Section 3.1 exempts the sale or lease of water systems serving less than five percent of a municipality's population, not proposed sales or leases below a certain dollar amount or water systems of a certain size. If the Legislature is interested in exempting sales or leases under a certain value or size, it will adopt legislation to achieve that result.
Petitioner next argues that the Legislature required the sale of a water system to be approved by ordinance, as opposed to a resolution, and preserved a twenty-day "waiting period" prior to enforcement of a Section 3.1 ordinance "to present an opportunity for Faulkner Act citizens to circulate petitions." Petitioner primarily relies upon Ordinance 04-75, supra, 192 N.J. at 465, 931 A.2d 595, in support of its claim. In Ordinance 04-75, supra, the Court, in reference to the twenty-day period mandated under Section 185, noted that "[t]he twenty-day grace period allows protesting citizens the time to file the requisite number of signatures necessary to *909 suspend implementation of the ordinance until a referendum vote." Ibid.
Respondents counter that there are a "plethora of reasons why an ordinance is required. . . ." Respondents, citing N.J.S.A. 40:49-1, note that adoption of an ordinance requires two readings, publication and a public referendum where all interested parties have the right to be heard concerning the ordinance. Unlike a resolution, which may be passed without public notice and an opportunity to be heard, an ordinance ensures the opportunity for public notice. Furthermore, respondents argue that the twenty-day delay provides an opportunity to challenge the ordinance by way of a complaint in lieu of prerogative writs before the ordinance becomes effective. R. 4:69.
The twenty-day provision does not advance petitioner's argument. The purpose of the twenty-day period mandated in Section 185  the statute delineating a referendum procedure  is to provide sufficient time to collect signatures for that specific referendum vote required by that specific statute. Section 181, on the other hand, is a general statute without reference to a referendum procedure, and there is no basis to conclude that the purpose of the twenty-day period under its provisions is to collect signatures for a referendum. Respondents correctly note that there are a litany of other rationales for a general twenty-day waiting period, including to provide time to properly challenge the ordinance. There is little support for petitioner's argument that the twenty-day period under Section 181 somehow affects Section 3.1. The provisions of the latter section are little affected by the general provisions of the former.
In sum, we conclude that the statutory construct of Section 3.1 precludes the necessity of a referendum to effectuate the sale of OWUS. It is also noteworthy that petitioner argues that the City's citizens are deprived of a referendum vote, but petitioner does not similarly argue that citizens in the Townships are deprived of a vote, when they are the ones most affected by the approved sale.

IV.
Petitioner challenges the factual determinations made by Judge Feinberg following the hearing conducted pursuant to petitioner's motion for reconsideration. Petitioner indirectly attacks the findings suggesting that the proposed sale is not of an independent "system" and will sever a single system. Petitioner also questions whether OWUS serves more than five percent of the City's population. Despite raising these issues, petitioner cites no facts that would undermine the trial judge's findings.
Judge Feinberg concluded "based on the record before [her] that OWUS and IWUS are two separate entities, with OWUS not serving anyone within the City." Specifically, she found that, "[t]here is no water flowing from OWUS to IWUS. There's no question that this transfer, this sale, is not going to influence the amount of water in IWUS." She added:
With regard to operations, as indicated by Tambini, the basic understanding of TWW operations is necessary to understand the fact that I provides water to O, but O does not provide water to I. TWW's sole production facility is a water treatment plant on the Delaware River, which pumps water to serve customers and fill the Pennington Reservoir. And it goes on. At the end it's clear that less than 5 percent are served by O.
All water supply conveyed outward through the CPS is always pumped outward into the central pumping zone and *910 outward from I to O. CPS pumps are always on to maintain service, and the CPS is not controlled from the levels in the O central pumping zone tanks.
The I central pumping zone does not float off of the O central pumping storage tanks. The service pressure in the I central pumping zone is created solely from the discharge pressure of the I central pumping station. Once water is pumped into the O central pumping zone, water in its tanks will fluctuate at a time but only to meet the demands within O.
The hydraulic computer modeling results establish the theories by Tambini. The flow of water and key transmission mains was reviewed to determine the direction of flow during model demand conditions. With regard to maximum daily demand, when the model simulated historically high maximum daily water demands, it generated good calibration results and established that water did not flow back from O to I.
Fire flow. The model simulated four fire flow scenarios, all located within I near the O boundary, and all placed in the general direction of each of the O central pumping zone storage tanks. The purpose of each scenario was to locate the fire demands at a point in O as close as possible to the O tanks to determine if there would be any flow reversal from O back to I. Each scenario tested a fire demand equal to a demand associated with a significant commercial fire and the upper limit of residential fire demands. During all fire events water continued to flow from I into O. No water from O tanks flowed back to I.
Power failure. This condition simulated power outage of the CPS to determine whether O facilities, including O tanks, provide water utility service to O at any point during the outage. This simulation assumed all CPS pumps were out of service. This simulation assumed the outage occurred on a peak demand day, August 6 of '05. Under these conditions the O and I portions of the central pumping zone act independently and differently during the outage. O tanks and facilities do not provide service to I during the outage. The I hydraulic grade line immediately drops to the gravity zone's HGL [hydraulic grade line] and is not supported by O tanks.
Catastrophic failure, the same thing. The OWUS storage tanks do not provide water service to I in the event of any emergency.
[(Emphasis added).]
All of these findings are supported by the Tambini report.
Judge Feinberg rejected petitioner's expert's opinion stating that it "does not establish that OWUS serves customers within the City; instead, it does nothing more than assert that some OWUS equipment has an impact on water pressure in some areas of the City. It falls short of proving OWUS provides water to the City or serves the residents in any way." In barring the expert's reply report on the motion for reconsideration, the judge also noted:
. . . [Mr. Yoerg] conducted no factual investigation in support of his claim that the O tanks supply water to Trenton residents. He admits that he conducted no independent factual investigation in preparing his report.
. . . .
[Mr. Yoerg] engaged in extensive calculations, at least in his original report. Using that data, he concludes that in all scenarios present by the report, O storage will not flow back into I. So he finally acknowledges that. He also . . . withdrew is conclusion that additional *911 storage would be required if the systems are separated.
It's interesting, because he withdrew many of the representations in his April 9th, 2009 certification, which would lead one to believe he's in line with the recommendation or the conclusion by Tambini, but then at the end he commits to that 58 percent, which, quite frankly, is totally inconsistent with other parts of his deposition.
There's no  and just with regard to the conclusions of Mr. Yoerg, from the exhibit that was presented by counsel, I think I've already mentioned that the Trenton Water Works is currently comprised of IWUS and OWUS, and he agreed with that in the deposition. The OWUS served less than 5 percent of the population. He agree [sic] with the assets and facilities in the I provided water utility service for customers in the I and to customers in the O, agreed with by Yoerg.
Nothing in the record before us supports a viable challenge to Judge Feinberg's findings. Her analysis accurately reflected the proofs before her, and her findings were well-supported by the record.

V.
Amicus FWW, for the first time, raises the argument that the approval of this sale undermines the Public Trust Doctrine (PTD). Before addressing the argument, we consider the role of an amicus.
An amicus brief may not raise issues not addressed by the parties, and if the brief raises such an issue, we may disregard it. State v. Nance, 148 N.J. 376, 385, 689 A.2d 1351 (1997). On the other hand, "an amicus may present different arguments than the parties relating to those issues." Lewis v. Harris, 378 N.J.Super. 168, 185 n. 2, 875 A.2d 259 (App.Div.2005), aff'd and mod. in part, 188 N.J. 415, 908 A.2d 196 (2006); Pressler, Current N.J. Court Rules, comment on R. 1-13-9 (2009). More leeway is appropriate when the other parties have had an opportunity to reply to the amicus brief. Lewis, supra, 378 N.J.Super. at 185 n. 2, 875 A.2d 259. Here, neither petitioner nor respondents, the parties to this action, addressed the PTD aspect, and because this appeal was expedited, respondents have not had an opportunity to respond to this argument. In any event, we conclude that it is without merit.
Amicus alleges that the PTD applies to the control of drinking water reserves, and all proceeds from the sale of a public utility asset must first go to pay off debts incurred from issuing bonds for the utility before spent elsewhere.[7]
Amicus only cites one case in support of its claim that OWUS is held in public trust, Mayor and Mun. Council of City of Clifton v. Passaic Valley Water Comm'n, 224 N.J.Super. 53, 64, 539 A.2d 760 (Law Div.1987), aff'd and mod. in part, 115 N.J. 126, 557 A.2d 299 (1989). See also McCarter v. Hudson County Water Co., 70 N.J. Eq. 525, 528, 61 A. 710 (Ch.1905) (noting that potable water is held in public trust), aff'd on other grounds, 70 N.J. Eq. 695, 65 A. 489 (E. & A.1906), aff'd on other grounds, 209 U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828 (1908). Amicus cites no New Jersey statutes or case law to support its claim that a municipality may not sell *912 property held in public trust without express legislative authority.
Ultimately, the thrust of amicus' claim is that the sale is without express statutory authority. Since the sale of OWUS is well-supported by statute, we may dismiss amicus' claim and need not decide (1) whether a water utility system is held in public trust; or (2) if there must be express statutory authority in order for a municipality to sell an item held in public trust.
Assuming, arguendo, that FWW's questionable interpretation of case law is correct, in that a water utility system is held in public trust and a municipality may not sell it without express statutory authority, the City and NJAWC still prevail. The statutory construct that we have discussed permits the sale of a water utility system and Section 3.1 enables a municipality to sell a water utility system serving less than five percent of that municipality with review by the BPU.
Although FWW raises an argument regarding the proceeds of the sale of OWUS, we note that N.J.S.A. 40:62-6 directs how a municipality must distribute the proceeds from the sale of a water utility system:
The proceeds from any sale shall be used for the retirement of bonds issued for the purposes of such plant, if any, or in case no such bonds are outstanding, then to the retirement of other bonds of the municipality. If no such bonds are outstanding the proceeds or any balance thereof may be used for the general purposes of the municipality. . . .
[N.J.S.A. 40:62-6 (emphasis added).]
However, that issue is not before us on appeal, and we decline to address it sua sponte. If the proceeds of the sale are disputed, the issue may be addressed in the appropriate forum.

VI.
Petitioner's true protest appears to be that Ordinance 09-02 will deprive the City of a significant source of income. While this court appreciates that petitioner and its members are genuinely concerned with the financial future of the City, the courts are not the proper forum to challenge the wisdom, as opposed to the validity, of Ordinance 09-02. See N.J. Shore Bldrs. Ass'n v. Jackson Twp., 199 N.J. 38, 55-56, 970 A.2d 992 (2009).
Pursuant to Section 3.1, Ordinance 09-02 is subject to BPU review, not a referendum. Neither petitioner's nor amicus' interpretations of the applicable statutory provisions compel this court to conclude otherwise. As such, both petitioner's and amicus' claims are without merit.
Affirmed.
NOTES
[1] The City and NJAWC shall be referred to collectively as respondents.
[2] Although the judge resolved the issue at the time of the initial hearing without the necessity of testimony, petitioner filed a motion for reconsideration that ultimately resulted in a plenary hearing. The procedural issues prompting the subsequent hearing are irrelevant to our decision. We comment on the facts adduced before Judge Feinberg, irrespective of at what stage of the proceedings the facts were developed.
[3] This certification prompted the judge to require a hearing on petitioner's motion for reconsideration.
[4] N.J.S.A. 40:62-3 provides:

Any municipality owning a sewer plant, water plant, heat, light or power plant, system of transportation, or other public utility plant or system, may lease or sell such plant or system. . . . Such a lease or sale to any person except another municipality, a sanitary sewerage authority, a sewerage authority or any other authority, commission or public body shall, except as otherwise provided by law, be made only upon compliance with the provisions of R.S. 40:62-4 [Section 4] and R.S. 40:62-5 [Section 5] and after the same is authorized by the legal voters of the municipality in accordance with said sections.
Section 4 provides that if the governing body of any municipality seeks to sell any plant or system, it must act by resolution, and advertise for bids. Section 5 states that upon receipt of the bids, the governing body may adopt an ordinance providing for the sale or lease of the plant or system. This ordinance shall be placed on a ballot at the next general election, and Section 5 details the form and content of the ballot. Because of the nature of the sale in issue, these provisions are not relevant to the issues raised on this appeal.
[5] Section 181(b) states: "No ordinance . . . shall take effect less than twenty days after its final passage by council and approval by the mayor. . . ."
[6] N.J.S.A. 40:49-1 provides:

The term "ordinance" when used in this subtitle means and includes any act or regulation of the governing body of any municipality required to be reduced to writing and read at more than one meeting thereof and published.
The term "resolution" when used in this subtitle means and includes any act or regulation of the governing body of any municipality required to be reduced to writing, but which may be finally passed at the meeting at which it is introduced.
[7] FWW does not allege that proceeds from the sale of the OWUS are being improperly used; FWW only claims, without citing the record, that "the City has admitted that a portion of the proceeds from the sale will go to the [C]ity's FY 2009 budget, and the citizens have always feared that proceeds from the sale will go toward operating expenses rather than retir[ing] bond indebtedness or replacing other capital assets."